UNITED STATES of America, Plaintiff,

v.

EKCO HOUSEWARES, INC., Defendant.

No. 5:92CV1245.

United States District Court,
N.D. Ohio,
Eastern Division.

Jan. 28, 1994.

Arthur I. Harris, Office Of The U.S. Atty., Cleveland, OH, Elliott Eder, Barry M. Hartman, John H. Grady, Dept. of Justice, Environment & Natural Resources Div., Environmental Enforcement Section, Washington, DC, for plaintiff.

Thomas T. Terp, Sr., Taft, Stettinius & Hollister, Cincinnati, OH, Steven M. Oster, Carolyn W. Conkling, John P. Dean, Susan F. Wegner, Bonni Fine Kaufman, Lois Godfrey Wye, Willkie, Farr & Gallagher, Washington, DC, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MATIA, District Judge.

### FINDINGS OF FACT

1. Both before and after the effective date of the regulations promulgated pursuant to the Resource Conservation and Recovery Act, as amended ("RCRA"), 42 U.S.C. §§ 6901, et seq., which is November 19, 1980, and until at least June 5, 1984, Ekco discharged wastewaters, containing hazardous wastes, from its operations to the surface impoundment located at the Massillon facility and treated, stored or disposed of those hazardous wastes in the surface impoundment located at its facility.

2. The RCRA financial responsibility requirements and the "financial responsibility requirements" referred to in Paragraph B(5) of the Partial Consent Agreement and Order ("PCAO") include the regulatory requirements for financial assurances for closure (40 C.F.R. § 265.143), financial assurances for post-closure care (40 C.F.R. § 265.145) and liability coverage (40 C.F.R. § 265.147).

3. A facility owner or operator, such as defendant, who treats, stores, or disposes of hazardous wastes after November 19, 1980, is obligated to maintain liability coverage for personal injury and property damage resulting from sudden and nonsudden accidental occurrences resulting from operations of the hazardous waste management unit, such as defendant's surface impoundment.

4. The obligation of the owner and operator of a treatment, storage or disposal facility to maintain liability coverage does not cease until final closure of the hazardous waste unit has been completed, pursuant to an approved plan, and the appropriate agency approves the closure and notifies the owner operator that the obligation has ceased.

5. A purpose of the liability coverage provision is to assure compensation of third persons who may suffer personal injury or property damage arising from the operation of the hazardous waste facility.

6. "Operation" of a hazardous waste facility consists of any sort of hazardous waste treatment, storage or disposal activity at that particular hazardous waste management unit.

7. A hazardous waste disposal unit is one in which hazardous waste is placed in or on the land or water and at which hazardous waste will remain after closure.

8. If hazardous waste remains after closure, including as a result of leaching into the groundwater, the unit is a disposal unit.

9. An example of a hazardous waste disposal unit is a surface impoundment.

10. This Court has found, and Ekco does not dispute, that Ekco discharged hazardous waste to the surface impoundment between 1980 and 1984, after the effective date of RCRA, with the intent that at least some of the waste would be permanently disposed of there. The August 1988 closure plan, submitted by Ekco to U.S. EPA and to Ohio EPA, proposed to treat the surface impoundment as a disposal unit. In July 1992, Ekco submitted a plan which proposed to "clean close" the unit and remove the hazardous waste. Thus, from at least August 1988 until at least July 1992, the surface impoundment was a "disposal" unit subject to the requirements of 40 C.F.R. § 265.145 and Ohio Administrative Code ("O.A.C.") § 3745–66–45.

11. The fact that Ekco ceased the discharge of hazardous waste into the surface impoundment prior to November 8, 1985 (the effective date of the loss of interim status provisions enacted as part of the 1984 Haz-

ardous and Solid Waste Amendments to RCRA ("1984 Amendments")), does not affect the status of the surface impoundment or the applicability of the financial responsibility regulations.

12. Facility owners or operators, such as Ekco, who "operated" a hazardous waste "treatment, storage or disposal" unit after November 19, 1980, are obligated to establish and maintain liability coverage for personal injury and property damage until the unit was closed pursuant to the applicable regulation. Such persons who operate "disposal" units are also obligated to maintain financial assurance for post-closure care of the disposal unit.

13. In order for an owner or operator to lawfully operate a hazardous waste management unit after November 19, 1980, the effective date of applicable RCRA regulations, that owner or operator must have obtained a permit or achieved "interim status."

14. A facility at which a hazardous waste management unit is used to treat, store or dispose of hazardous waste after the effective date of RCRA is subject to the standards set forth at 40 C.F.R. Part 265, and those standards apply even to the owners and operators who did not achieve interim status or obtain a permit.

15. By November 19, 1980, Ekco did not submit to EPA "Part A" of its application for a permit to treat, store or dispose of hazardous wastes as required by Section 3005 of RCRA, 42 U.S.C. § 6925, and 40 C.F.R. § 270.10. Because the "Part A" application was not submitted by November 19, 1980, Ekco did not receive "interim status" as set forth under § 3005 of RCRA, 42 U.S.C. § 6925.

16. Congress mandated that EPA establish financial responsibility standards for owners and operators of hazardous waste management units. The financial responsibility requirements under RCRA became effective in July 1982.

17. In 1984, Congress passed the Hazardous and Solid Waste Amendments to RCRA, in part due to concerns over significant levels of noncompliance with the financial responsibility regulations. The 1984 amendments essentially added a statutory sanction to ongoing regulatory violation.

18. The 1984 amendments to RCRA did not change the applicability of the financial responsibility requirements. The 1984 amendments emphasized the importance of full compliance with the financial responsibility requirements. An owner or operator could only retain interim status by certifying compliance with the financial responsibility requirements and groundwater monitoring.

19. The liability coverage requirements apply to unclosed facilities even if no further discharge of hazardous waste occurred there after the 1984 RCRA amendments.

20. The requirement to establish financial assurance for closure is viewed by EPA as very important. Liability coverage is an important component of the RCRA regulations. It is designed to protect against the risk intrinsically associated with hazardous waste management and provide protection to members of the general public for unexpected or unanticipated occurrences which could affect health or property.

21. The State of Ohio Environmental Protection Agency ("OEPA") is authorized to administer aspects of the RCRA hazardous waste program in the State of Ohio in lieu of the federal RCRA program.

22. OEPA's administration of the RCRA program includes monitoring compliance with federal consent agreements entered into under RCRA.

23. Pursuant to a Memorandum of Understanding, dated July 22, 1988, between the U.S. EPA and the State of Ohio, OEPA was authorized to oversee certain aspects of the RCRA program in Ohio, including the financial responsibility requirements, prior to June 30, 1989.

24. On June 30, 1989, the State of Ohio received authorization, pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, to administer and enforce a hazardous waste management program under RCRA. As of June 30, 1989, the State of Ohio was fully authorized to administer certain aspects of the hazardous waste management program under RCRA.

25. On November 5, 1986, EPA filed an Administrative Complaint, Findings of Violation and Compliance Order, Docket No. V–W–87–R–008, against Ekco.

26. Among the Findings of Violation was Ekco's failure to comply with the financial responsibility requirements under 40 C.F.R. §§ 265.140–150.

27. On or about November 4, 1987, U.S. EPA and Ekco entered into a Partial Consent Agreement and Order ("PCAO") which partially resolved the November 5, 1986, Administrative Complaint.

28. The PCAO was executed by a duly authorized officer of Ekco. The PCAO was not executed by anyone from, on behalf of, or affiliated with American Home Products Corporation ("AHP").

29. Pursuant to the terms of Paragraph B(5) of the PCAO, Ekco was required to "[c]omply with the financial responsibility requirements for closure until closure has been certified, pursuant to 40 C.F.R. §§ 265.140 through 265.151, at the time of the submission of the closure plan for the surface impoundment pursuant to Paragraph B(1)."

30. Paragraph B(1) of the PCAO required Ekco to submit a closure plan within 90 days of the effective date of the PCAO.

31. Pursuant to the terms of the PCAO, Ekco was unambiguously obligated to provide financial assurance for closure under 40 C.F.R. § 265.143, financial assurance for post-closure care under 40 C.F.R. § 265.145, and liability coverage under 40 C.F.R. § 265.147 upon the submission of the closure plan.

32. From the effective date of the PCAO until June 30, 1989, Ekco was required to comply with the applicable Federal regulations found at 40 C.F.R. §§ 265.143, 145 and 147. From and after June 30, 1989, defendant was required to comply with the State of Ohio hazardous waste regulations found at O.A.C. §§ 3745–66–43, 45 and 47.

33. In addition to monitoring Ekco's compliance with the Ohio regulations, Ohio EPA was monitoring Ekco's compliance with the RCRA financial responsibility requirements pursuant to the PCAO.

34. In March 1988, Ohio EPA notified Ekco of its failure to comply with the State of Ohio financial responsibility requirements.

35. Ekco did not comply as a result of the March 1988 notice.

36. Ekco submitted a closure plan to U.S. EPA and OEPA in August 1988. The closure plan contained a proposal that the wastes in the impoundment remain in place and that the impoundment be treated as a "disposal" unit.

37. At the time of submission of the closure plan, despite the requirements of the PCAO, neither Ekco, nor anyone in its behalf, submitted documentation of compliance with any of the financial responsibility requirements found at 40 C.F.R. §§ 265.140–150 or O.A.C. §§ 3745–66–40 through 50.

38. On or about January 4, 1989, OEPA provided a written disapproval of Ekco's closure plan based on technical deficiencies that OEPA enumerated.

39. The January 4, 1989, disapproval notice described the right to seek an adjudication hearing, expressly requiring that the request for a hearing "shall specify the issues of fact and law to be contested."

40. On or about February 2, 1989, Ekco filed a Request for Adjudication of OEPA's disapproval of the closure plan. The Request for Adjudication specified the issues which Ekco wished to have adjudicated.

41. Ekco's Request for Adjudication did not request review of or refer to the financial responsibility requirements.

42. Pursuant to the PCAO, Ekco was to have documented its compliance with the financial responsibility regulations at the time of the submission of the closure plan. From at least August 1988, Ekco should have established and maintained compliance with the financial responsibility regulations.

43. As of August 1988, Ekco had not submitted any documentation of compliance with the financial responsibility regulations to OEPA or to U.S. EPA.

44. The obligation to comply with the financial responsibility requirements was not contingent upon any other state regulation.

The obligation to establish and maintain financial responsibility at the time of submission of the closure plan was not contingent upon compliance with or approval of any other requirement under any other provision of the PCAO. These financial responsibility obligations were not contingent upon the submission or approval of the closure plan, or the submission or approval of cost estimates for closure or post-closure care. Ekco's obligation to establish and maintain financial assurances continued after the disapproval of the closure plan. The obligation to maintain liability coverage is not contingent upon a comprehensive assessment of technical information or upon the existence or extent of environmental contamination at a facility.

45. At the time, in August 1988, that Ekco had submitted a proposed closure plan, Ekco was able to, and did, submit cost estimates for closure and post-closure care.

46. Ekco's claim that it could not establish financial assurances until the closure plan was approved is without basis. In fact, Ekco had prepared a closure plan and developed cost estimates for closure and post-closure care as early as January 1988.

47. The owner or operator of a hazardous waste management unit should be fully capable of predicting the cost of closing the unit. The obligation to establish and maintain financial assurance for closure and post-closure care is not dependent upon whether a closure plan has been submitted or approved by the regulatory agency, and the obligation exists even if a closure plan is not timely submitted or if the closure plan is disapproved.

48. Ekco never advised U.S. EPA that it was unable to comply with the financial responsibility regulations. Ekco never advised U.S. EPA that it did not understand the regulations.

49. The financial responsibility requirements are important components of the RCRA program, which is designed for the protection of human health and the environment. The liability coverage provisions insure that funds are available to compensate persons who may suffer injury or property damage as a result of the hazardous waste activity. The regulations also act as inducement to owners and operators to properly maintain the hazardous waste facility.

50. U.S. EPA advised Ekco that its violation of the regulations and the PCAO were serious violations.

51. By entering into a consent agreement with the United States to resolve past violations, and then continuing those violations and violating the terms of the consent agreement, Ekco has caused the United States to expend resources and has hindered U.S. EPA's ability to secure compliance with the RCRA program.

52. The liability coverage component of the financial responsibility regulations is considered important to EPA in order to afford the public with a sense of security regarding the potential risks, such as bodily injury or property damage, associated with the management of hazardous wastes.

53. The liability coverage requirement is intended to remain in place throughout the closure process, protecting against the risks associated with closure itself.

54. The closure process itself contains risks of exposure. Ohio EPA was concerned that during the closure process the contaminated soils might become airborne.

55. In reviewing the closure proposal, Ohio EPA was concerned about the highly contaminated sludge and subsoils in the surface impoundment and the potential for contact with the underlying water table.

56. As of the date Ekco finally complied fully with the liability coverage provision, March 11, 1993, Ekco had not stabilized the hazardous metals contained in the soils at the surface impoundment. The closure work to stabilize the metals did not commence until August of 1993.

57. The assessment of civil penalties is important to EPA in order to deter the particular party from future violations of the specific RCRA regulation and all RCRA regulations. It is also important to deter violations by other regulated parties. It also serves to eliminate or reduce the economic advantage of noncompliance that violators gain over those who comply.

58. The failure to comply of a party who enters into an administrative consent agreement, such as Ekco, has a negative impact upon the regulatory program and causes the EPA to expend public resources to enforce the agreement.

59. Other factors considered important to EPA are the extent of the violation, the duration of the violations, the seriousness of the violations, potential for harm occasioned by the violation, the good-faith efforts to comply, and any economic benefit attributed to noncompliance.

60. Ekco did not fully comply with the financial assurances and liability coverage requirements until September 9, 1992, and March 11, 1993, respectively.

61. From at least August 15, 1988, until the date Ekco fully complied with the requirements for financial assurance for closure, Ekco was in continuous violation for 1,486 days.

62. Ekco was in continuous violation of the requirement to establish and maintain financial assurances for post-closure care from at least August 1988 until July 1992, the date it submitted a proposed closure plan for off-site removal of the hazardous waste in the surface impoundment. This violation lasted at least 1,445 days.

63. Ekco was in continuous violation of the requirement to establish liability coverage for personal injury and property damage resulting from both sudden and nonsudden accidental occurrences from at least August 15, 1988, until the date Ekco fully complied, March 11, 1993. This was a total of 1,675 days.

64. The number of days for which Ekco is subject to a civil penalty of $25,000.00 per day for failing to maintain financial assurances for closure, post-closure care and liability coverage for accidental occurrences is 4,606 days.

65. On or about March 17, 1988, OEPA notified Ekco that it was in violation of the RCRA regulations at its facility pursuant to the O.A.C. and the Code of Federal Regulations.

66. The March 17, 1988, notice informed Ekco that the facility must "establish financial assurance for closure (40 C.F.R. § 265.-143 and O.A.C. § 3745–66–43), and for liability coverage (40 C.F.R. § 265–147 and O.A.C. § 3745–66–47)."

67. On September 22, 1989, OEPA sent Ekco a letter again notifying it that it had failed to comply with the Ohio regulations, O.A.C. Rules 3745–66–42 through 3745–66–47, with regard to financial responsibility. The September 22, 1989, letter notified Ekco that it "must have and maintain ... financial assurance for closure and post-closure care, and liability coverage for sudden and nonsudden accidental occurrences." Ekco was also notified of its obligations under the PCAO. The Notice reminded Ekco that terms of the PCAO which it had entered into with U.S. EPA "required compliance with financial assurance requirements until final closure, pursuant to 40 C.F.R. 265.140 through 265.151."

68. In addition to advising Ekco of its ongoing violation of the State of Ohio financial responsibility regulations, and its obligation pursuant to the PCAO, the September 22, 1989, notice accurately advised Ekco of the requirement to revise its cost estimates for closure, in order to adequately establish financial assurances.

69. On September 28, 1989, six days after the September 22, 1989 letter, Ekco Housewares, through counsel, discussed with OEPA the financial responsibility requirements and the contents of the September 22, 1989, letter. OEPA advised Ekco that it could not wait until approval of the closure plan to comply with the financial responsibility requirements.

70. Ekco was able to, and did, develop cost estimates for closure and post-closure in January 1988, with estimated combined costs for closure and post-closure care of $2.4 million. Ekco developed cost estimates for closure and post-closure in August 1988, with estimated combined costs of $1.7 million.

71. At no did time OEPA advise Ekco that it could not submit the financial assurances for closure until the closure plan was approved.

72. There is no evidence that Ekco attempted to submit revised cost estimates or financial assurances for closure and post-closure care which were rejected because the closure plan was not approved.

73. Ekco did not submit revised cost estimates for closure until July 1992.

74. Ekco, or its agent in its behalf, was able to, and did in fact, develop cost estimates for each revision to the closure plan.

75. If a proposed closure plan is disapproved, as in Ekco's case, an owner or operator of a hazardous waste management unit can revise cost estimates for closure by referring to the comments and attachments contained in the disapproval correspondence.

76. Ekco understood the requests being made in the disapproval notice and was able to estimate the costs of meeting the requirements in that letter. In fact, in this instance, Ekco, through its agent, was able to, and did, develop cost estimates for the items listed in the notice of disapproval.

77. On or about March 12, 1990, OEPA again notified Ekco, informing Ekco in writing that it was violating O.A.C. Rules 3745–66–42 through 3745–66–47, and that it was also violating terms of the November 4, 1987, PCAO with U.S. EPA.

78. On April 23, 1990, Ekco submitted to OEPA a copy of its general liability policy for the Massillon facility.

79. The general liability policy, submitted by Ekco on April 23, 1990, contained an absolute exclusion for pollution related claims. Ekco was advised on May 3, 1990, that the general liability policy was insufficient. Additional discussion with Ekco's representative took place on May 15, 16 and 17, 1990. Ekco was aware of the pollution exclusion at the time it submitted the policy.

80. The general liability policy submitted by Ekco on April 23, 1990, did not meet the requirements of 40 C.F.R. § 265.147(A) or (B), and O.A.C. § 3745–66–47(a) or (b).

81. Between September 22, 1989, and April 1992, Ekco Housewares, or its representative, communicated by telephone with representatives of OEPA regarding financial responsibility at least 20 times.

82. During the numerous telephone conversations between OEPA and representatives from Ekco, there was discussion, among other things, of the necessity of compliance and available means and mechanisms of compliance.

83. Between September 22, 1989, and April 1992, Ekco Housewares, or its representative, exchanged written communications with representatives of OEPA regarding financial responsibility approximately 8 to 10 times.

84. On March 17, 1988, September 22, 1989, March 12, 1990, October 16, 1990, July 8, 1991, August 2, 1991, August 11, 1992, and December 24, 1992, Ekco Housewares, or its representatives, were advised that the company was not in compliance with the financial responsibility requirements under State of Ohio regulations and/or under the PCAO.

85. Not once during the numerous telephone conversations and correspondences which occurred between September 22, 1989, and April 1992, did Ekco or its representatives advise OEPA that it believed it had received a waiver of the obligation to comply with the financial responsibility requirements or an extension of the time for compliance.

86. On February 12, 1990, Ekco, through counsel, discussed with OEPA the requirements of a Letter of Credit for purposes of compliance with the financial assurances for closure and post-closure care regulations. OEPA informed Ekco that Ekco Housewares and the Ekco facility must be named in the Letter of Credit.

87. On June 11, 1990, a request was filed on behalf of Ekco for a variance from the requirement to maintain liability coverage for nonsudden accidental occurrences, pursuant to O.A.C. § 3745–66–47.

88. In late June of 1990, Ekco requested OEPA not to act on its variance request.

89. On or about June 25, 1990, a Letter of Credit and Standby Trust Agreement was submitted on behalf of Ekco to OEPA to document financial assurance for closure of the surface impoundment.

90. Neither Ekco, nor anyone in its behalf (including AHP) submitted any docu-

mentation of compliance with the requirement to maintain liability coverage for sudden and nonsudden occurrences with the June 25, 1990, submission. Neither Ekco nor anyone in its behalf (including AHP) submitted any documentation of compliance with Ekco's requirement to maintain liability coverage for sudden and nonsudden occurrences on June 25, 1990.

91. The Letter of Credit, submitted on June 25, 1990, did not name the Massillon facility or Ekco. This submission, which failed to name Ekco, was inconsistent with the previous discussions between OEPA and counsel for Ekco, where Ekco was advised that the Letter of Credit must name Ekco.

92. Ekco claims that AHP was obligated to comply with the required financial assurances and liability coverage on behalf of Ekco and that AHP could have done so relatively inexpensively. Yet neither Ekco nor AHP attempted compliance with the financial assurance provisions until June 25, 1990, and the liability coverage provision until September 1992.

93. On October 11, 1990, OEPA advised Ekco, through counsel, of certain amendments to the regulations which allowed for a third party with a "substantial business relationship" to demonstrate liability coverage.

94. On or about October 16, 1990, OEPA notified Ekco, its representative, and AHP, that the June 25, 1990, submission of a Letter of Credit and Standby Trust Agreement was inadequate to meet the requirements of 40 C.F.R. §§ 265.13 and 145 or O.A.C. §§ 3745–66–43 and 45.

95. On or about November 20, 1990, further documentation was submitted on behalf of Ekco to correct some, but not all, of the deficiencies identified in the June 25, 1990, submission concerning financial assurance.

96. On or about July 8, 1991, OEPA informed Ekco and AHP of continuing violations of the provisions of O.A.C. §§ 3745–66–43, 45 and 47.

97. On August 2, 1991, OEPA informed Ekco and AHP that it would not approve the request for a variance from the liability coverage requirements because Ekco had failed to demonstrate adequately that "the risks associated with the operations of the Massillon facility dictate an elimination of nonsudden financial responsibility required by rule 3745–66–47." The notice stressed to Ekco that unless and until such a variance was approved, the coverage required under that provisions must be maintained.

98. In the August 2, 1991, notice, OEPA also advised Ekco that during the pendency of the variance request it must maintain liability coverage. The letter also noted the continuing violation of the liability coverage requirements.

99. On August 11, 1992, OEPA sent a notice to Ekco and AHP which noted that the Massillon facility was in continuing violation of the requirements of, *inter alia*, O.A.C. §§ 3745–66–43, 45 and 47, and the provisions of Ekco's November 4, 1987, PCAO with U.S. EPA.

100. On September 9, 1992, documentation was finally submitted on behalf of Ekco to correct the deficiencies in its June 25, 1990, submission and to meet the requirements of 40 C.F.R. §§ 265.143 and 145 and O.A.C. §§ 3745–66–43 and 45 for financial assurance for closure and post-closure care. No evidence of compliance with the liability coverage provisions had been submitted at this time.

101. Prior to at least June 25, 1990, neither Ekco Housewares nor anyone in its behalf submitted any documentation to attempt to establish financial assurance for closure or post-closure care of its surface impoundment.

102. Between September 29, 1992, and October 20, 1992, Ekco first submitted documentation of liability coverage by means of a corporate guarantee, one of the methods allowed under the regulation. This submission, however, did not fully satisfy the statutory requirements because it failed to include a certified independent auditor's report as required under O.A.C. § 3745–66–47 and the guarantee had been backdated.

103. Ohio EPA could not ascertain the existence of an enforceable "substantial business relationship" between Ekco and AHP unless and until such time as it was docu-

mented and supported by a corporate guarantee. No such documentation was presented until the September 29, 1992, submission. The liability coverage documentation is then available to the public upon request. The documentation of liability coverage allows the public to be assured of a source for compensation for injuries which may result from hazardous waste activities.

104. On December 24, 1992, OEPA advised Ekco and AHP of the deficiencies in the September 29 and October 20, 1992, submissions.

105. Not until March 11, 1993, did Ekco submit documentation to OEPA which was sufficient to demonstrate that it adequately met the liability coverage requirements of 40 C.F.R. §§ 265.147(a) and (b) or O.A.C. §§ 3745–66–47(A) and (B).

106. From at least August 15, 1988, until at least June 25, 1990, Ekco failed to comply with the terms of the PCAO that it had entered into with U.S. EPA. At no time during this time period did AHP fulfill these obligations on Ekco's behalf.

107. From at least August 12, 1988, until at least June 30, 1989, Ekco failed to comply with the requirements of 40 C.F.R. §§ 265.-143, 145 and 147. At no time during this time period did AHP fulfill these obligations on Ekco's behalf.

108. From at least June 30, 1989, until at least June 25, 1990, Ekco failed to comply with the requirements of O.A.C. §§ 3745–66–43 and 45. At no time during this time period did AHP Corporation fulfill these obligations on Ekco's behalf.

109. From at least June 30, 1989, until at least September 29, 1992, Ekco failed to comply with the requirements of O.A.C. §§ 3745–66–47(A) and (B). At no time during this time period did AHP fulfill these obligations on Ekco's behalf.

110. During the period in which Ekco had failed to maintain liability coverage, there had been evidence of groundwater contamination at the facility.

111. The wastewaters discharged to the surface impoundment between November 1980 and June 1984 were contaminated with, among other things, 1,1,1 trichloroethane ("TCA") and trichloroethylene ("TCE"). A source of these contaminants was the cooling water which was discharged to the surface impoundment until June 1984.

112. The surface impoundment sludges and subsoils displayed elevated levels of volatile organic compounds. Sampling of the waters in the surface impoundment in 1984 indicated the presence of TCA and TCE. TCA was found in the surface impoundment waters at concentrations of 3,600 parts per billion.

113. Ekco's analyses concerning the surface impoundment indicate the presence of three heavy metals (lead, cadmium and chromium) in elevated concentrations in the sludge and subsurface soils.

114. Sludge and soil sampling has indicated cadmium, chromium and lead occur at elevated concentrations at the facility.

115. Analytical results of the sludge and subsurface soils beneath the surface impoundment indicated a range of concentrations for cadmium of up to 8,370 parts per million ("ppm"); for lead up to 25,000 ppm, and for chromium up to 923 ppm.

116. Elevated levels of lead, a hazardous constituent, were detected in a well, No. L–5, outside the confines of the surface impoundment and downgradient from the surface impoundment.

117. Vinyl chloride was also detected in well L–5 in 1988 and in 1990.

118. Sampling from the vicinity of the surface impoundment indicates that hazardous substances, including lead, chromium, cadmium, TCA, TCE and vinyl chloride, have been emanating from the surface impoundment.

119. Hazardous wastes or constituents have been identified in the groundwater in the vicinity of the Ekco facility, specifically in the vicinity of the surface impoundment.

120. Ekco's analyses concerning the surface impoundment also indicate that organic compounds detected in and beneath the surface impoundment have been found in the groundwater beneath the Massillon facility.

121. Groundwater flow direction in the vicinity of the Ekco plant can vary significantly.

122. Based on data provided by Ekco Housewares, the surface impoundment is the source of hazardous waste, TCE, in wells downgradient from the impoundment.

123. Beneath the Ekco facility there are two distinct aquifers.

124. The sandstone bedrock aquifer is directly beneath the Ekco facility. The sand and gravel or "Tuscarawas River" aquifer is adjacent to the Ekco facility.

125. The Tuscarawas River aquifer is a major source of drinking water supply for the City of Massillon.

126. There are four public drinking water wells within 2,500 feet of the Ekco facility. Ekco's Massillon plant is within one-half (½) mile of the City of Massillon, Ohio's municipal water wells Nos. 1 through 4.

127. The City of Massillon well No. 4 was closed on September 2, 1986. Prior to the shutdown of well No. 4, sampling confirmed the presence of vinyl chloride in the well. The public drinking water well No. 4 is maintained by the Ohio Water Service and is 1,000–1,500 feet to the east of the Ekco facility. It has been abandoned due to the presence of contamination.

128. One of the contaminants discovered in the drinking water well, vinyl chloride, is a degradation product of TCA and TCE.

129. The contaminants in the groundwater beneath the surface impoundment are the same type as the contaminants identified in the abandoned drinking water well, Ohio Water Service Well No. 4.

130. The Ekco facility is a likely source for the contaminants found in the Ohio Water Service Well No. 4.

131. As of July 1991, Ekco's groundwater monitoring system was not operated and maintained to determine the rate and extent of migration and concentrations of hazardous wastes in groundwater associated with the management of the hazardous waste surface impoundment. That is the purpose of groundwater monitoring requirements.

132. Lead, chromium, cadmium, TCA, TCE and vinyl chloride are hazardous substances.

133. A hazardous substance is a substance which has the potential to have a deleterious influence on human health.

134. Most of the hazardous substances identified above, lead, chromium, cadmium, TCA, TCE and vinyl chloride, are known or suspected carcinogens.

135. The threshold level of risk associated with carcinogenic effects of hazardous substances can be produced by levels down to zero.

136. Cadmium is a toxic metal to which exposure can result from inhalation or ingestion. Cadmium is retained in the kidney and liver. The possibility of accumulation over time is a concern to human health.

137. Cadmium can cause, among other things, lung inflammation, emphysema, lung cancer and kidney damage to humans.

138. The primary concern from cadmium exposure is cancer.

139. Testing performed by Wadsworth Laboratories Testing Company, on behalf of Ekco, indicated that cadmium was leaching from the surface impoundment.

140. Concentrations of cadmium would be of concern at approximately 100 to 200 parts per million. Ekco's sampling indicated cadmium concentrations at the facility in the thousands of parts per million.

141. Lead is a toxic substance which has a propensity to accumulate in the body over time.

142. Lead exposure can occur through inhalation or ingestion, and its effects are primarily neurological, as well as having effects on bone marrow, with a risk of kidney cancer.

143. The most important toxicological effect of lead is the possible toxicity to children. Lead risks include possible brain damage and damage to development of the nerve system. Lead may have an irreversible effect in developmental stages in children.

144. The effects of lead exposure can occur at very low levels.

145. The sampling data from the soils in or around Ekco's surface impoundment indicated the presence of extremely high levels of lead.

146. Chromium is a toxic metal which can cause lung inflammation and is associated with lung cancer. In addition to exposure by inhalation or ingestion, there is evidence that dermal exposure is a route of access for chromium into the human body.

147. The sampling data from the soils in the surface impoundment indicated high levels of chromium.

148. EPA has determined that the presence of cadmium, chromium, lead, TCA, TCE, vinyl chloride and dichlorobenzene in the soils, surface water or groundwater detected at the Ekco facility requires a response to protect human health and the environment.

149. Ekco had determined that because of the elevated levels of cadmium, chromium and lead in the surface impoundment sludges there was a potential that the metals could be carried in the groundwater.

150. Ekco's consultants determined that a potential contaminant pathway of concern was that contaminated groundwater would be consumed by downgradient drinking water well users.

151. Ekco's consultants also determined that until the surface impoundment was stabilized and capped, the hazardous waste contaminants could potentially leach into the groundwater and that rainfall could percolate through the surface impoundment sludges and mobilize the hazardous waste contaminants.

152. During the years when Ekco failed to maintain liability coverage, the surface impoundment was not capped or stabilized.

153. Surface water runoff posed another pathway for hazardous waste contaminants to be mobilized. Wells L-4 and L-5, which were outside the perimeter of the surface impoundment, contained evidence of contamination. Evidence indicates that flood conditions have existed in the vicinity of the surface impoundment, and surface water could have entered wells L-4 and L-5 and mobilized contaminated soils.

154. Ekco's consultant also determined that the risk of exposure by air dispersal of contaminated sludge could occur during construction activities in and around the surface impoundment, including the closure process. The risk associated with the hazardous wastes in the surface impoundment would continue until closure was completed.

155. TCE is a volatile organic compound, and exposure to it can occur through inhalation. The primary toxicological effect from TCE is neurological; TCE affects the central nervous system.

156. The other primary toxicological effect of TCE is in the liver. Exposure to TCE is associated with both kidney and lung cancer.

157. TCE dissolves readily in water and therefore can be transported readily wherever the water goes. TCE persists in an underground aquifer system and can move along with ground water. Once in the ground water, volatile organic compounds are persistent and do not easily correct themselves.

158. Based on a review of the data, levels of TCE in the surface impoundment and in the groundwater exceed levels of concern for human health.

159. TCA is also a volatile organic compound. It has a propensity to affect the central nervous system. Exposure to TCA poses possible genetic effects.

160. Dichloroethylene ("DCE") and vinyl chloride are known to be degradation products of TCE. If TCE exists in the groundwater, over a period of time, it degrades first to DCE and then to vinyl chloride.

161. DCE was detected in the groundwater in the vicinity of the surface impoundment at levels that exceed concern for human health.

162. Vinyl chloride is also a toxic organic compound. Exposure to it can occur by inhalation or ingestion, as well as by dermal absorption.

163. Vinyl chloride has been associated in humans with toxic effects, such as lung fibrosis, lung emphysema, and liver cancer.

164. Vinyl chloride was detected in the groundwater in the vicinity of the surface impoundment at the Ekco facility at levels which are of concern to human health.

165. Vinyl chloride was also detected in the public drinking water well, Ohio Water Service Well No. 4, at levels which are of concern to human health.

166. During the time period that Ekco was obligated and failed to maintain liability coverage, there was a potential of exposure to hazardous wastes which possess extremely adverse health risks associated with such exposure. This potential could lead to a liability claim for personal injury—the type of injury the liability coverage is designed to protect.

167. As a result of its failure to comply with the terms of its agreement with U.S. EPA under the PCAO and with the applicable regulations under RCRA promulgated at 40 C.F.R. §§ 265.140–150 and O.A.C. §§ 3745–66–40 through 50, Ekco has obtained an economic benefit as a result of its noncompliance.

168. As a result of its violation of the requirement to establish and maintain financial assurances for closure and post-closure care of its hazardous waste surface impoundment from August 15, 1988, until November 30, 1990, Ekco gained an economic benefit of at least $75,297.00.

169. As a result of its violation of the requirement to establish and maintain liability coverage for its hazardous waste surface impoundment from August 15, 1988, until September 29, 1992, Ekco gained an economic benefit of between $359,281.00 and $538,922.00.

170. The only way to determine the exact cost of insurance for Ekco's hazardous waste surface impoundment would have been for Ekco to have had insurance agents conduct the analysis, but Ekco failed to seek insurance for the relevant time period.

171. At a minimum, Ekco's economic benefit resulting from its noncompliance of the PCAO and applicable regulations was $434,000.00.

172. Ekco has incurred an economic benefit of at least $434,000.00–$614,000.00 due to its failure to establish and maintain financial assurances for closure, post-closure care and liability coverage for its hazardous waste surface impoundment, as required under the PCAO and as required under the applicable RCRA regulations.

173. Ekco has the ability to pay a significant civil penalty for its violations of RCRA and the PCAO.

174. There is no evidence that Ekco, or AHP on behalf of Ekco, made any effort to obtain liability coverage which would comply with the applicable regulation prior to September 1992.

175. The indemnity agreement which Ekco alleges existed between it and AHP did not unconditionally obligate American Home Products to provide liability coverage for the hazardous waste surface impoundment at the Ekco facility.

176. Ekco did not know whether the alleged indemnity was unconditional when it chose not to comply with its obligations.

177. Ekco was aware that OEPA was requesting compliance with the regulations requiring financial assurances for closure, post-closure care and liability coverage between 1988 and 1992.

178. There is no evidence presented indicating that Ekco discussed anything regarding the financial responsibility requirements with the Ohio Assistant Attorney General ("AAG") prior to December 27, 1991. That December 27, 1991, letter does not support the claim that any waiver of compliance was given. There is no evidence that a waiver of compliance or an extension to comply was *ever* given. As of June 4, 1991, the Ohio AAG had not acknowledged in writing that there had been any purported extension or waiver of the financial responsibility requirements. The Ohio AAG would not have forwarded any comments to Ekco without first consulting with OEPA and receiving OEPA's permission to do so.

179. There is no convincing evidence of reliance by Ekco on any statements allegedly made by an Ohio AAG in not complying with the PCAO or the applicable regulations. The evidence submitted by Ekco, a letter dated September 25, 1992, from the State of Ohio AAG to counsel for the United States was sent to Ekco over four years after it was to have complied with the PCAO. Prior to receiving a copy of that letter, Ekco did not have any information upon which to base its claim of reliance.

180. The history of negotiations with the Ohio AAG regarding settlement of the closure plan, as incorporated in a January 25, 1993, agreement, does not include references to the financial responsibility requirements. Ekco did not make financial responsibility requirements part of the appeal that was the subject of this settlement.

181. The OEPA did not ask Ohio AAG to address financial responsibility requirements in its negotiations with Ekco.

182. The attorney representing Ekco appeared to have a thorough understanding of the issues surrounding the adjudication of the closure plan and of the requirements of the Ohio regulations.

183. The agreement, which Ekco alleges existed, to revisit the financial responsibility issues was only procedural in nature. That alleged agreement did not occur until around December 27, 1991. This was long after Ekco had been advised on numerous occasions of its continuing violations. Ekco, or its representatives, were advised that Ekco was not in compliance with the financial responsibility requirements under State of Ohio regulations and/or under the PCAO.

184. Ekco never indicated to OEPA during the numerous telephone conversations and correspondences which occurred between September 22, 1989, and April 1992, that it believed it had received a waiver of the obligation to comply with the financial responsibility requirements or an extension of the time for compliance. Ekco never informed the Ohio AAG during the closure plan negotiations that it had received numerous requests for compliance.

185. Ekco never advised U.S. EPA of its alleged receipt of an extension for, or waiver of, compliance with the financial responsibility requirements.

186. The Ohio AAG never informed Ekco, or its representative, that Ekco did not need to fulfill the requirements of the Ohio regulations with respect to financial assurances for closure. The Ohio AAG never informed Ekco, or its representative, that it did not need to comply with the Ohio regulation with respect to liability coverage.

187. The Ohio AAG never represented to Ekco anything other than that the Ohio regulation requires compliance at all times.

### CONCLUSIONS OF LAW

1. As the owner and operator of a hazardous waste treatment, storage or disposal ("TSD") facility in existence prior to November 19, 1980, Ekco was subject to the interim status requirements. Ekco did not, however, obtain interim status. *See* Opinion, pp. 8–9.

2. Because hazardous waste was discharged to the surface impoundment at the Ekco facility after the effective date of the Resource, Conservation and Recovery Act, as amended ("RCRA"), 42 U.S.C. §§ 6901, *et seq.*, Ekco was subject to the RCRA regulations for TSD facilities including financial responsibility requirements at 40 C.F.R. §§ 265.140–150 and O.A.C. §§ 3745–66–40 through 50. *See* Opinion, p. 10.

3. As an owner or operator of a RCRA hazardous waste TSD facility, Ekco was required, but failed, to have and maintain sudden accidental occurrence coverage under 40 C.F.R. §§ 265.147(a) and (b) and under O.A.C. Rules 3745–66–47(A) and (B). 40 C.F.R. § 265.147(a) provides substantially as follows:

> An owner or operator of a hazardous waste treatment, storage or disposal facility, or group of such facilities, shall demonstrate financial responsibility for bodily injury and property damage to third parties caused by sudden accidental occurrences arising from operations of the facility or group of facilities. The owner or operator shall have and maintain liability coverage

for sudden accidental occurrences in the amount of at least $1 million per occurrence with an annual aggregate of at least $2 million, exclusive of legal defense costs. This liability coverage may be demonstrated as specified in subsections (a)(1), (a)(2) (by passing a financial test or using a specified guarantee for liability coverage), (a)(3) (obtaining a specified letter of credit), (a)(4) (obtaining a specified surety bond), (a)(5) (obtaining a specified trust fund) and (a)(6) (using a combination of the foregoing instruments).

40 C.F.R. § 265.147(b) provides:

An owner or operator of a surface impoundment, landfill or land treatment facility which is used to manage hazardous waste, or group of such facilities, shall demonstrate financial responsibility for bodily injury and property damage to third parties caused by nonsudden accidental occurrences arising from operations of the facility or group of such facilities. The owner or operator shall have and maintain liability coverage for nonsudden accidental occurrences in the amount of at least $3 million per occurrence with an annual aggregate of at least $6 million, exclusive of defense costs. An owner or operator meeting the requirements of this Section may combine the required per-occurrence [and aggregate] coverage levels for sudden and nonsudden accidental . . . into a single annual aggregate level [$4 million per occurrence and $8 million aggregate].

4. The "operations" of a facility which must be insured against include any type of hazardous waste TSP since the effective date of RCRA. Findings of Fact No. 6.

5. The RCRA regulations contemplate that the financial responsibility requirements shall be in place both before and during the closure process. See Opinion, p. 5. The obligation to maintain liability coverage, therefore, remains until the hazardous waste management unit is "closed" pursuant to applicable regulation and an approved plan. See 40 C.F.R. § 265.147(e); O.A.C. § 3745–66–47(E); see also Findings of Fact No. 4. The Hazardous and Solid Waste Amendments of 1984 to RCRA ("1984 Amendments"), which included the loss of interim status provisions, did not affect that obligation. Findings of Fact Nos. 18, 19. The 1984 Amendments added a statutory sanction to noncompliance with the RCRA requirements; that is, in order to retain interim status, certification of compliance was required. Findings of Fact Nos. 17, 18. The fact that Ekco had stopped actively discharging hazardous wastes to, but had not yet closed, the surface impoundment did not affect Ekco's obligation to have established the required coverage, nor did it eliminate the risks associated with the hazardous wastes contained in or emanating from the surface impoundment, the very risks that liability coverage is designed to protect against. See, e.g., 40 C.F.R. § 265.147(e); see also Findings of Fact Nos. 4, 5, 11, 12, 18, 19, 52, 53, 150–51.

6. Ekco did not have interim status, therefore, it could not have retained interim status under the 1984 Amendments. See Opinion, p. 8.

7. Ekco discharged hazardous waste to its surface impoundment after the effective date of RCRA (Opinion, p. 10), therefore, it "operated" the surface impoundment and was subject to the requirement to establish and maintain liability coverage pursuant to the RCRA regulations until closure had been certified. 40 C.F.R. § 265.147; Findings of Fact No. 6.

8. By failing to have and maintain liability coverage for personal injury and property damage resulting from sudden and nonsudden occurrences for its surface impoundment, Ekco violated 40 C.F.R. §§ 265.147(a) and (b) and the corresponding Ohio regulations at O.A.C. §§ 3745–66–47(A) and (B) on a continuing basis until March 11, 1993. See Opinion, pp. 4, 7.

9. Under 40 C.F.R. § 265.145 and O.A.C. § 3745–66–45, Ekco was required to establish and maintain financial assurances for post-closure care of its hazardous waste "disposal" unit until closure had been certified and approved. See 40 C.F.R. § 265.145(h); Opinion, p. 5.

10. This Court now finds that, for the purposes of 40 C.F.R. § 265.145 and O.A.C. § 3745–66–45, Ekco owned and operated a

hazardous waste "disposal" unit after the effective date of the regulation. Therefore, Ekco was obligated to establish and maintain financial assurances for post-closure care of the surface impoundment until, pursuant to the provisions of O.A.C. § 3745–66–45(H) or 40 C.F.R. § 265.145(h), Ekco is no longer obligated to maintain post-closure financial assurances. *See* 40 C.F.R. § 265.145(h) and O.A.C. § 3745–66–45(H).

11. By failing to establish and maintain financial assurances for post-closure care of the surface impoundment, during the period from at least August 1988 until September 9, 1992, Ekco violated the provisions of the Partial Consent Agreement and Order ("PCAO") and the applicable regulations found at 40 C.F.R. § 265.145 and O.A.C. § 3745–66–45. Opinion, p. 7.

12. Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), provides that:

> any person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of violation shall, for purposes of this subsection, constitute a separate violation.

13. Pursuant to Sections 3008(c) and (g) of RCRA, 42 U.S.C. §§ 6928(c) and (g), Ekco is liable for civil penalties not to exceed $25,000.00 per day for each day of each violation of RCRA, applicable U.S. EPA and State of Ohio EPA regulations at 40 C.F.R. §§ 265.143, 145, 147, and O.A.C. §§ 3745–66–43, 45, 47, and Ekco's obligations pursuant to the PCAO.

14. The assessment of a civil penalty is committed to the informed discretion of the Court. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 230 n. 6, 95 S.Ct. 926, 930–31 n. 6, 43 L.Ed.2d 148 (1975); *United States v. Phelps Dodge Industries, Inc.,* 589 F.Supp. 1340, 1362 (S.D.N.Y.1984); *United States v. T & S Brass and Bronze Works, Inc.,* 681 F.Supp. 314, 322 (D.S.C. 1988), *aff'd in part and vacated in part on other grounds,* 865 F.2d 1261 (4th Cir.1988).

15. In exercising this discretion, the Court should give effect to a major purpose of a civil penalty: deterrence. *See U.S. EPA v. Environmental Waste Control, Inc.,* 710 F.Supp. 1172, 1242 (N.D.Ind.1989), *aff'd* 917 F.2d 327 (7th Cir.1990); *United States v. T & S Brass and Bronze Works, Inc., supra; Chesapeake Bay Foundation v. Gwaltney of Smithfield,* 611 F.Supp. 1542, 1556 (E.D.Va. 1985), *aff'd* 791 F.2d 304, 315 (4th Cir.1986), *rev'd on other grounds,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987); *United States v. Phelps Dodge Industries, Inc., supra,* at 1358; *United States v. Swingline, Inc.,* 371 F.Supp. 37, 47 (E.D.N.Y.1974).

16. Even if the defendant is unlikely to repeat its violation, a substantial penalty is warranted to deter others. *Student Public Interest Research Group of New Jersey, Inc. v. AT & T Bell Laboratories,* 617 F.Supp. 1190, 1200 (D.N.J.1985), *aff'd in part and rev'd in part on other grounds,* 842 F.2d 1436 (3rd Cir.1988); *United States v. Phelps Dodge Industries, Inc., supra,* at 1367.

17. Substantial civil penalties are appropriate where a defendant has violated prior consensual agreements with environmental agencies. *See United States v. M. Genzale Plating, Inc.,* 807 F.Supp. 937 (E.D.N.Y. 1992).

18. To serve a deterrent function, the penalty must be high enough so that noncompliance presents a substantial monetary risk for the polluter. In addition, the civil penalty must be large enough to ensure that polluters cannot simply absorb the penalty as a cost of doing business.

19. Although RCRA does not outline precise factors that should be taken into account when assessing a penalty, this Court adopts the approach used by a number of courts in looking for guidance by analogy to a section of CERCLA, 42 U.S.C. § 9609(a)(3), which empowers the United States to impose civil penalties administratively. That section specifies that the following factors should be considered: (1) the nature, circumstances, extent and gravity of the violations; (2) the violator's ability to pay, prior history of such violations, and degree of culpability; (3) economic benefit or savings (if any) resulting from the violation; (4) such other matters as justice may require. *See, e.g., United States v. M. Genzale*

*Plating, Inc., supra; U.S. EPA v. Environmental Waste Control, Inc., supra; United States v. T & S Brass and Bronze Works, Inc., supra.* Such penalty cannot exceed $25,000.00 per day for each day of each violation of RCRA.

20. Based on the number and duration of violations in this case, Ekco's total maximum statutory exposure for civil penalties in this case is $115,150,000.00 (4,606 violation days; *see* Findings of Fact No. 64).

21. Ekco violated RCRA, and/or the terms of the PCAO, its 1987 agreement with the United States, for over four years. Its violation was as a result of its conscious disregard for its clear regulatory and contractual obligations. For example, Ekco ignored repeated notices and communications from the Ohio EPA, the agency charged with assuring its compliance with the RCRA financial responsibility regulations. *See, e.g.,* Findings of Fact Nos. 81–84. Ekco knew, and unconditionally agreed to, the terms and conditions of the PCAO in November 1987, but failed even to attempt to comply with the financial responsibility requirements until June of 1990. *See* Findings of Fact No. 106. Ekco then continued to stall and delay further and did not come into complete compliance until 1993.

22. Despite its prior knowledge of its obligations under the PCAO, and the regulatory status for the hazardous waste in its surface impoundment, Ekco failed to fully comply with the RCRA financial responsibility requirements, as required by the PCAO, from at least August 15, 1988, until March 11, 1993. *See* Opinion, p. 7.

23. The very purpose of the financial responsibility requirements is to assure that the public can rely on the clean up of the hazardous waste in an expeditious manner and be compensated for any accidental injuries. Findings of Fact No. 166.

24. Furthermore, the testimony indicates that Ekco's failure to maintain adequate RCRA groundwater monitoring during the same period that it failed to maintain liability coverage left the Ohio EPA, U.S. EPA and the general public without sufficient knowledge regarding the risk associated with the hazardous waste surface impoundment—a risk which includes the potential contamination of surrounding drinking well supplies. Findings of Fact Nos. 127–131.

25. An evaluation of the factors considered by other courts in assessing civil penalties in environmental cases leads this Court to conclude that a substantial penalty is warranted in this case in view of the seriousness, willful nature, and the length and scope of the violations at Ekco's Massillon facility, the economic benefit realized by Ekco from its noncompliance, and the need to deter future violations by Ekco and other regulated entities.

26. Ekco has failed to exercise good-faith efforts to comply with the terms and conditions of the PCAO and the requirements under the applicable RCRA regulations. Instead, the record demonstrates that Ekco's noncompliance has been tied to a calculated strategy of avoiding compliance with these requirements until the United States filed this lawsuit. While Ekco, like any other litigant, is entitled to mount a good-faith challenge to the applicability of rules and regulations, Ekco is not entitled to use delay, obfuscation and, ultimately, the courts to attempt to cast aside regulatory obligations that not only are clear, but are obligations that Ekco had agreed to and has known for over four years were applicable to its Massillon facility.

27. In construing Ekco's assertion that it acted in good faith when it failed to comply with financial responsibility requirements, this Court will look at the repeated effort of Ohio EPA to obtain Ekco's compliance and Ekco's repeated failure to do so. Findings of Fact Nos. 65–109. This Court may also consider Ekco's claim that AHP could have complied in Ekco's behalf with relative ease and the fact that neither Ekco nor AHP took any steps toward compliance.

28. In this case, Ekco is subject to penalty for its violations of RCRA and the PCAO for at least 4,606 days: 1,486 days for its violation of the requirement to establish and maintain financial assurances for closure, 1,445 days for its violation of the obligation to establish and maintain financial assurances

for post-closure care, and 1,675 days for its violation of the obligation to establish and maintain liability coverage for personal injury and property damage arising from the operation of the surface impoundment. Findings of Fact Nos. 61–64. Accordingly, Ekco's maximum statutory civil penalty exposure in this case is $115,150,000.00.

29. The scope of the defendant's violation in this case is significant. It is appropriate for this Court to look to the fact that for almost two years (August 1988 until June 1990) there was a complete absence of any effort or attempt at compliance by Ekco. Findings of Fact Nos. 90, 101. Even then, efforts to comply were inadequate and directed to only a portion of the requirements. Findings of Fact Nos. 89–91.

30. Ekco's violation of RCRA and the terms of the PCAO have resulted in, and/or at all relevant times had the potential for resulting in, harm to the environment at and around the Massillon facility. There is evidence of the releases of hazardous wastes or hazardous constituents from the surface impoundment at Ekco's Massillon facility. Findings of Fact Nos. 118, 139, 161, 164.

31. By failing to establish the required financial responsibilities prior to closing its hazardous waste management unit, Ekco created a potential risk to the public that the surface impoundment might not be finally closed or that third parties might not be compensated for injuries or damage without resorting to prolonged and unnecessary litigation. Ekco's argument that since there were no claims for injury or damage it should not be penalized is not well taken. This Court may consider the potential for harm as well as the actual harm in assessing a penalty. Ekco should not be credited with what amounts to sheer good luck that no claims have been made in the face of documented contamination.

32. Although the United States has not alleged, in this action, that Ekco has been dilatory in closing the surface impoundment, the fact remains that the surface impoundment is not yet closed. The evidence in this case indicates that, prior to September of 1993, Ekco had not yet commenced the closure of the surface impoundment and, therefore, the risks associated with hazardous waste in and around the surface impoundment at Ekco's facility—risks that the liability coverage provisions are designed to cover—had not been eliminated or minimized. Findings of Fact Nos. 110–166.

33. In assessing a civil penalty, this Court does not need to find that an actual injury to the public has occurred; rather, the Court may assess the potential injury to the public.

34. The record is clear that the hazardous waste identified at the Ekco facility poses a significant threat to human health, including the possibility of cancer, respiratory and kidney problems. Findings of Fact Nos. 132–148, 155–163. The record is also clear, as evidenced by the testimony of Ekco's own consultant, that Ekco was aware of the potential for exposure from these wastes during the time period that it failed to maintain the liability coverage required under the PCAO and pursuant to the applicable regulation. Findings of Fact Nos. 149–154.

35. Throughout this same period there was evidence of groundwater contamination in the vicinity of the Ekco facility and in the public drinking water supply. Findings of Fact Nos. 110–130.

36. A substantial civil penalty is appropriate in this case to deprive Ekco of the economic benefit it gained as a result of its noncompliance with the law. In this case, Ekco realized an economic benefit of at least $434,000.00 through its failure to maintain financial responsibility in accordance with the applicable RCRA regulations. See Findings of Fact No. 171. At an absolute minimum, the assessment of a civil penalty must remove the economic incentives of noncompliance with RCRA and to deter others who might be tempted to profit through violation of federal and state environmental laws. Therefore, the total economic benefit of $434,000.00 accrued by Ekco in this case should serve as a floor below which the civil penalty will not be mitigated. However, it is not sufficient merely to deprive Ekco of benefits it reaped through unlawful conduct. An appropriate civil penalty must also create substantial disincentives to deter Ekco, and others, from the kind of protracted, willful

violation of important regulatory requirements that occurred in this case.

37. The financial responsibility requirements are important components of the RCRA program. Findings of Fact No. 49. Ekco has caused the United States to expend time and resources by entering into the PCAO with EPA and then ignoring its provisions, thus requiring EPA to seek judicial relief. Findings of Fact. Nos. 51, 58. A significant penalty is appropriate to deter Ekco, and others, from thinking that obligations assumed in settlement agreements or imposed by the regulations are trivial matters.

38. Ekco has failed to present sufficient evidence to justify mitigation of a penalty based on its claim of waiver or estoppel. Ekco has failed to provide convincing evidence of reliance upon statements allegedly made by officials at the Ohio EPA and/or the Ohio Attorney General's office. One of the key elements in establishing a defense of waiver or estoppel is that the party claiming such a defense relied on the representations made by the other party. *See* Findings of Fact Nos. 179, 184. In fact, the record is clear that Ohio EPA repeatedly informed Ekco of its obligation to comply with the financial responsibility requirements. *See* Findings of Fact Nos. 82–84. The testimony of the Assistant Attorney General for the State of Ohio is also clear that he did not at any time advise Ekco that it need not comply with the law. Findings of Fact No. 186. Moreover, the only record of any discussions between the Ohio AAG and Ekco regarding financial responsibility indicates that the earliest date any such discussions were had was late in 1991, over three years past the time that Ekco was obligated to comply. Findings of Fact No. 183.

39. Based on the foregoing criteria and the specific circumstances of this case, the Court finds that a penalty of $1,000.00 for each day of violation is appropriate. The Court has previously found that Ekco was in violation for at least 4,606 days (Findings of Fact Nos. 61–64). Therefore, the defendant Ekco Housewares, Inc., is hereby ordered to pay $4,606,000.00 in civil penalties.

40. Any Finding of Fact that should be deemed a Conclusion of Law is incorporated herein by reference.