**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**EKCO HOUSEWARES, INC.,**
**Defendant–Appellant.**

No. 94–3268.

United States Court of Appeals,
Sixth Circuit.

Argued June 7, 1995.

Decided Aug. 16, 1995.

Rehearing and Suggestion for
Rehearing En Banc Denied
Nov. 2, 1995.

Andrea Nervi Ward (briefed), J. Carol Williams (argued), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, Arthur I. Harris, Asst. U.S. Atty., Cleveland, OH, for plaintiff-appellee.

Lois Godfrey Wye, John P. Dean (argued and briefed), Willkie, Farr & Gallagher, Washington, DC, for defendant-appellant.

Before: MARTIN and JONES, Circuit Judges; JOINER, District Judge.[*]

JOINER, District Judge.

Defendant, Ekco Housewares, Inc., appeals a $4,606,000 civil penalty imposed under the Resource Conservation Recovery Act, 42 U.S.C. §§ 6901–6987. The district court found that Ekco had violated federal regulations and a consent order in failing to provide documentation of its financial responsibility pending closure of a hazardous waste site. The court assessed a fine of $1000 per day for each of the violations. On appeal, Ekco challenges its liability under one of the regulations and the corresponding consent order obligation, and otherwise contends that the district court abused its discretion in imposing so large a penalty, and in not taking certain mitigating factors into account.

We affirm in part, reverse in part, and remand for further proceedings.

## I.

### A.

**Resource Conservation and Recovery Act and Regulations**

The Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901–6987 is a comprehensive statute governing the generation, transportation, storage, and treatment of hazardous wastes so as to "minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b).

The RCRA prohibits the operation of any hazardous waste management facility, except in accordance with a permit. 42 U.S.C. § 6925(a). Recognizing that the Environmental Protection Agency could not issue permits to all applicants before November 19, 1980, the RCRA's effective date, Congress provided that a facility could obtain "interim status" to allow it to operate pending final administrative action on its permit application. *Northside Sanitary Landfill, Inc. v. Thomas,* 804 F.2d 371, 373–74 (7th Cir.1986). A facility could obtain interim status if it notified the EPA of its activities involving hazardous wastes, and submitted a Part A permit application. *Id.;* 42 U.S.C. §§ 6925(e)(1), 6930(a).

Facilities that obtained interim status, as well as those that did not, were required to comply with certain operating standards promulgated by EPA. 40 C.F.R. § 265.1(b). At issue in this case are three "financial requirements" set forth in 40 C.F.R., Part 265, subpart H, §§ 265.140–150, specifically: (1) § 265.143, entitled "Financial assurance for closure," which requires owners and operators of treatment, storage, and disposal (TSD) facilities to demonstrate that they have sufficient assets in place and available in a specified manner to provide for appropriate closure of the facilities; (2) § 265.145, entitled "Financial assurance for post-closure care," which requires a similar showing for post-closure care of the facilities; and (3) § 265.147, entitled "Liability requirements," which requires owners and operators to demonstrate financial responsibility for third-party bodily injury or property damage claims arising from operations at the facilities.

The EPA may authorize a state to administer and enforce a hazardous waste management program. The state of Ohio obtained such authorization, and its RCRA program is managed by the Ohio Environmental Protection Agency (Ohio EPA). The United States retains concurrent authority to enforce the applicable RCRA provisions. 42 U.S.C. § 6928. Ohio has adopted financial require-

---

[*] The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

ments substantially identical to the federal regulations.

### Ekco's Massillon Facility; American Home Products Corporation

Ekco has a facility in Massillon, Ohio, where it manufactures various household products. From the 1950s until 1978, Ekco discharged liquid wastes containing lead and cadmium-bearing sludge into an unlined surface impoundment at the facility. In 1980, Ekco began discharging another kind of waste into the impoundment, noncontact cooling water which had been pumped from a well on the site and circulated through pipes outside degreasers as a cooling step in the manufacturing process. In 1984, Ekco discovered the existence of trichloroethylene and trichloroethane (TCE and TCA) in the groundwater beneath the plant. Ekco's investigation revealed that a well at the site was the source of the contamination, and that the discharged cooling water in the surface impoundment also contained TCE and TCA. Ekco stopped discharging into the impoundment in June 1984 and never resumed.

In September 1984, shortly after the contamination was discovered, Ekco's corporate parent, American Home Products Corporation (AHP), sold Ekco to The Ekco Group, Inc. Pursuant to the purchase agreement, AHP agreed to indemnify and hold Ekco harmless from certain environmental liability, including liability associated with the surface impoundment at the Massillon facility and the costs of remediation and closure of the impoundment. The parties stipulated that AHP always had sufficient funds to pay for closure and post-closure care of the impoundment and third-party injury or property damage claims. AHP's indemnity obligation did not extend, however, to claims which "may have been exacerbated by actions other than by AHP and its agents" which occurred after the sale. Ekco agreed to pay that portion of such claims, and both parties reserved the right to file suit regarding their respective obligations.

### Administrative Complaint and Consent Order

Pursuant to 42 U.S.C. § 6930, Ekco notified the EPA in 1980 that the Massillon facility was generating hazardous wastes, but did not inform the EPA that the Massillon facility was treating, storing, or disposing of hazardous wastes, and did not submit the Part A application required to obtain interim status for that facility. In November 1986, the EPA filed an administrative complaint against Ekco, alleging that Ekco stored hazardous wastes at the Massillon facility without a permit or interim status, and failed to comply with the financial requirements of 40 C.F.R. §§ 265.140–150. Ekco and the EPA entered into a partial consent order one year later that required Ekco to submit a closure plan for the facility within 90 days and, at the same time, to "[c]omply with the financial responsibility requirements for closure until closure has been certified, pursuant to 40 CFR 265.140 through 265.151[.]" The order provided that failure to comply with any of its provisions would subject Ekco to civil penalties under the RCRA. The parties entered into a second consent agreement by which Ekco agreed to pay an administrative penalty of $55,478 for its violations.

### Eventual Closure of the Impoundment and Compliance with Financial Requirements

Ekco's initial closure plan, submitted on August 12, 1988, called for retention of the hazardous waste on the site through stabilizing and solidifying the waste so that it would not escape from the impoundment. Ohio EPA rejected the plan several months later, but invited Ekco to conduct tests to determine if the stabilization proposal would work. Ekco subsequently conducted a treatability study and other tests. Eventually, in July 1992, Ekco submitted a "clean closure" plan, one that contemplated the removal of all hazardous waste from the site. The clean closure plan was approved in 1993.

This case does not directly concern the contamination and closure of the Massillon surface impoundment but, rather, Ekco's lengthy delay in complying with its obligations to document that it had secured financial resources for the impoundment's closure and post-closure care, and to satisfy third-party claims arising out of the contamination. The record reflects that Ekco repeatedly was notified that it was in violation of the applicable regulations and consent or-

der. Ekco was so notified in March 1988, but did not comply. In August 1988, Ekco submitted its initial closure plan, but did not comply with the financial responsibility requirements at that time, as required by the consent order. In September 1989, the Ohio EPA again notified Ekco that it was in violation of the regulations and the consent order. The notice referred to the fact that Ekco's initial closure plan had been disapproved, and stated that Ekco's closure "estimates must be revised ... before [Ekco] establishes a financial assurance mechanism(s) for closure and postclosure care[.]" One week later, an Ohio EPA representative told Ekco's attorney that Ekco's financial responsibility obligations were not contingent on submittal or approval of a revised closure plan. Still Ekco did not comply. In March 1990, Ohio EPA sent Ekco another notice of violation.

Ekco ultimately decided to satisfy its obligation to establish financial assurances for closure and post-closure care through submitting a letter of credit, as permitted by 40 C.F.R. § 265.143(c), and, AHP submitted a $ 1.5 million letter of credit to Ohio EPA on June 25, 1990. The letter of credit substantially complied with the applicable regulation's requirements, § 264.151(d), but had several defects which were brought to Ekco's attention in October 1990.[1] Plaintiff presents *no evidence or claim that the letter of credit was not valid and negotiable as originally submitted.* Ekco submitted documentation to correct some of the defects in November 1990, and corrected the remaining problems in September 1992. Ohio EPA later notified Ekco that the financial assurance for closure violation was deemed abated as of September 1992, and that Ekco was no longer required to provide financial assurance for post-closure care in light of its submittal of a clean closure plan.

Ekco's efforts to timely demonstrate financial responsibility for third-party claims were less impressive. In April 1990, Ekco's attorney sent Ohio EPA a copy of Ekco's general liability policy, aware that it contained pollu-

tion exclusions. Ohio EPA advised that the policy was insufficient in May 1990. In June 1990, Ekco requested a variance from the liability coverage requirement, but, later that month, requested Ohio EPA not to act on the request. No further action was taken until September 29, 1992, when Ekco submitted AHP's guarantee, by which AHP obligated itself to satisfy Ekco's third-party liability. Ohio EPA found the guarantee defective because it had an effective date of September 1, 1988. Ohio EPA apparently inferred that Ekco backdated the guarantee to absolve itself of liability for its lengthy delay in submitting proof of liability coverage, and required that the effective date be made contemporaneous with the date of issue. Ekco made the requested change on March 11, 1993.

**B.**

The United States filed suit against Ekco in June 1992, prior to Ekco's final abatement of its violations. The complaint alleged that Ekco violated both the regulations and the 1987 consent order in failing to comply with the financial responsibility requirements, and sought injunctive relief and administrative penalties in amounts up to $25,000 per day for each violation, as permitted by 42 U.S.C. § 6928. Ruling on the parties' cross-motions for summary judgment, the district court held that the consent order obligated Ekco to establish financial assurance for closure and post-closure care and to demonstrate financial responsibility for third-party claims, and that Ekco had an independent obligation under 40 C.F.R. § 265.143 to establish financial *assurance for closure. The court reserved* the questions whether Ekco was bound to establish financial assurance for post-closure care and to demonstrate responsibility for third-party claims under §§ 265.145 and 265.147, respectively, and decided those issues adversely to Ekco following trial.

The court thus concluded that Ekco violated both the consent order and the regulations in not complying with all three financial

---

1. Ekco neglected to forward a duplicate original of the stand-by trust agreement. Additionally, the letter of credit was issued to AHP, not Ekco, and did not name Ekco or state that it was for Ekco's benefit. Finally, the letter of credit was not accompanied by a letter setting forth Ekco's address and identification number, and the fact that Ekco was relying on the letter of credit.

responsibility requirements, and calculated the number of days on which Ekco was in violation, starting with August 15, 1988, the date on which the consent order first required submission of financial responsibility documentation. The court stopped the clock:

(1) with respect to Ekco's obligation to establish financial assurance for closure (§ 265.143), on September 20, 1992, the day before Ohio EPA received the final documentation to cure technical defects in the letter of credit (1486 days);

(2) with respect to the obligation to establish financial assurance for post-closure care (§ 265.145), on or about July 28, 1992, when Ekco submitted a plan for clean closure (1445 days); and

(3) with respect to the obligation to demonstrate financial responsibility for third-party claims (§ 265.147), on March 11, 1993, the date on which Ekco resubmitted AHP's guarantee bearing a 1992 rather than a 1988 effective date (1675 days).

The court assessed a penalty of $1000 per day for each day on which Ekco was in violation, for a total of $4,606,000. *United States v. Ekco Housewares, Inc.*, 853 F.Supp. 975 (N.D.Ohio 1994).

## II. Liability for Violating Obligations to Establish Financial Assurances for Closure and Post–Closure Care

Ecko does not challenge the district court's holding that it violated both the consent order and the regulations, §§ 265.143 and 265.145, in failing to comply with its obligations to establish financial assurances for closure and post-closure care. Thus, the only question raised on appeal as to these two requirements is the reasonableness of the penalty imposed, discussed in Part IV.

## III. Liability for Violating Obligation to Demonstrate Financial Responsibility for Third–Party Claims

The district court found that Ekco's obligation to demonstrate financial responsibility for third-party claims arose from two independent sources: the consent order, by which Ekco unambiguously agreed to comply with 40 C.F.R. § 265.147; and § 265.147 itself. Ekco challenges both bases for the district court's holding. Our affirmance on either ground is sufficient to affirm the district court's finding that Ekco was in violation of an obligation, and thus subject to civil penalties. We review the district court's holdings de novo.

### A. 40 C.F.R. § 265.147

■ At first blush, it is difficult to conceive of a basis on which Ekco could dispute its obligation to comply with § 265.147, whatever the scope of its obligations in the consent order. The district court correctly found that Ekco operated the Massillon impoundment as a disposal facility from at least August 1988 to July 1992; that, although Ekco never obtained interim status, it was nonetheless subject to the Part 265 financial requirements; and that § 265.147 requires an owner/operator of a hazardous waste facility to demonstrate financial responsibility for third-party claims throughout the closure process until final closure is certified. § 265.147(e).[2] The conclusion which follows is that Ekco was obligated to comply with § 265.147 until the impoundment's final closure was certified, and violated its obligation.

Ekco attempts to side-step the requirements of § 265.147 by relying on the 1984 Hazardous and Solid Waste Amendments to the RCRA, Pub.L. 98–616 (1984). Included in those amendments is the provision codified at 42 U.S.C. § 6925(e), which operated to put an outside limit on interim status. Pursuant to § 6925(e), an existing land disposal facility would lose interim status unless the facility applied for a final determination regarding its permit and certified that it was in compliance with all groundwater monitoring and financial responsibility requirements by November 8, 1985, the loss of interim status (LOIS) deadline. Congress initially provided for interim status to allow hazardous waste facilities to operate, while giving the EPA sufficient time to act on permit applications. As indicated by the LOIS amendment, Con-

---

**2.** *See also* 51 Fed.Reg. 16422 (1986) (explaining time period for which liability coverage must be procured).

gress determined in 1984 that owners/operators should move out of this short-term status and into full RCRA compliance. In 1985, the EPA issued Interim Status Standards for implementation of the 1984 amendments. 50 Fed.Reg. 38946 (1985). These standards made clear that the consequence of loss of interim status was closure of the facility in question.

Ekco contends that early cases construing the LOIS amendment had the effect of excusing facilities from compliance with the financial responsibility requirements if they shut down by that date. Ekco states that it had ceased operating the surface impoundment in 1984, when it stopped discharging waste into it,[3] and therefore was excused from compliance. We disagree.

The cases relied upon by Ekco are those in which owners/operators contended that they could not certify compliance with the financial responsibility requirements prior to the LOIS deadline because it was impossible to obtain insurance coverage which would enable them to do so. These cases suggest that an owner/operator would not be required to certify compliance with the financial responsibility requirements if it simply ceased operations prior to the LOIS deadline. *See United States v. Clow Water Sys.,* 701 F.Supp. 1345, 1348 (S.D.Ohio 1988); *United States v. Allegan Metal Finishing Co.,* 696 F.Supp. 275, 285 (W.D.Mich.1988); *United States v. T & S Brass and Bronze Works, Inc.,* 681 F.Supp. 314, 319–20 (D.S.C.), *aff'd in part and vacated in part on other grounds,* 865 F.2d 1261 (4th Cir.1988) (Table). None of these cases, however, directly confronts the issue posed here, whether an owner/operator must nonetheless satisfy the financial responsibility requirements imposed by subpart H of Part 265 until final closure of the facility in question is certified. Moreover, the approach suggested in these cases is wholly unsatisfactory, as it would operate to reward those owners/operators which flouted the interim status and LOIS

requirements by exempting them from complying with the financial responsibility requirements until final closure of their facilities, while leaving the balance of the regulated community subject to those requirements.

We decline to transform a statutory penalty—the loss of interim status—into an absolution from otherwise applicable regulatory obligations. Construing § 6925(e) in this manner would defeat its obvious goal of bringing facilities into full compliance with the RCRA. *See In re Gordon Redd Lumber Co.,* RCRA Appeal No. 91–4, 1994 RCRA LEXIS 29 at *55 (June 9, 1994) (rejecting argument that respondent was not required to comply with § 265.147 because it had chosen to cease operations). We therefore conclude that Ekco's obligation to comply with § 265.147 was not affected by the 1984 LOIS amendment, and affirm the district court's holding that Ekco violated § 265.147 and was subject to civil penalties as a result.

**B. Consent Decree**

■ The consent order required Ekco to "[c]omply with the financial responsibility requirements *for closure* until closure has been certified, pursuant to 40 C.F.R. 265.140 through 265.151[.]" Ekco claims that the emphasized words required it only to establish financial assurances for closure and post-closure care pursuant to § 265.143 and § 265.145, respectively, and that the decree did not include the obligation to demonstrate financial responsibility for third-party claims as set forth in § 265.147. The question thus presented is whether § 265.147 imposes a "financial responsibility requirement for closure" in the context of the consent order at issue. We conclude that it does.

As an initial matter, there is no question but that § 265.147 is a "financial responsibility requirement." Congress directed the EPA to promulgate regulations setting forth performance standards necessary to protect human health and the environment, including standards relating to "financial responsibili-

---

**3.** Ekco did not "cease operating" the impoundment when it stopped actively discharging waste into it in 1984. Rather, as the district court found, Ekco operated the impoundment as a disposal facility from at least 1988 to 1992, as evidenced by its initial plan to maintain the

waste at the site after closure. *See* 40 C.F.R. § 270.2, defining "disposal facility" as one at which hazardous waste is intentionally placed into or on the land or water, and at which hazardous waste will remain after closure.

ty." 42 U.S.C. § 6924(a)(6). *See also* § 6924(t) (itemizing types of financial responsibility requirements permissible). Section 265.147 is one of the "financial requirements" enumerated in subpart H of Title 40, Part 265. The Federal Register notices pertaining to Part 265's requirements refer to § 265.147 as a financial responsibility requirement. *See* 52 Fed.Reg. 44,314 (1987); 51 Fed.Reg. 25,350 (1986). The obligation set forth in § 265.147 is, by its own terminology, a "financial responsibility" requirement, and § 265.147 expressly is included by the consent order's reference to those regulations found at "40 C.F.R. §§ 265.140 *through* 265.151." (Emphasis added.)

To accept Ekco's argument, it would be necessary to hold that the words "for closure" negate the otherwise plain meaning of the language at issue, and limit Ekco's duties to establishing "financial assurance" for closure and postclosure care pursuant to §§ 265.143 and 265.145. This construction is untenable. The consent order does not refer to the "financial assurances" requirements, but to the broader category of "financial responsibility requirements," of which § 265.147 clearly is one. The parties entered into the consent order contemplating that the surface impoundment would be closed, and agreed that Ekco would comply with the financial responsibility requirements when it submitted its closure plan. By its reference to "for closure," the consent order merely incorporates the course of action planned by the parties, and agreed upon in the very same instrument. In sum, we are presented with no basis [4] on which to disturb the district court's construction of the terms of the consent order. Pursuant to the unambiguous language of that order, Ekco was obligated to comply with § 265.147.

## IV. Whether District Court Abused its Discretion in Setting Amount of Penalty

Section 3008(g) of the RCRA provides:

Any person who violates any requirement of this subtitle shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation.

42 U.S.C. § 6928(g). Subsection (c) provides that a violation of a compliance order also renders the violator subject to a $25,000 per day penalty. In imposing civil penalties, it is appropriate for the court to take into account the seriousness of the violation and any good faith efforts to comply. *See* 42 U.S.C. § 6928(a)(3). Numerous other factors are relevant, including the harm caused by the violation, any economic benefit derived from noncompliance, the violator's ability to pay, the government's conduct, and the clarity of the obligation involved. *United States v. Bethlehem Steel Corp.*, 829 F.Supp. 1047, 1055 (N.D.Ind.1993) (collecting cases). The assessment of civil penalties is committed to the informed discretion of the court, and we review only for abuse of discretion. *United States v. Midwest Suspension and Brake*, 49 F.3d 1197, 1205 (6th Cir.1995) (citing *United States EPA v. Environmental Waste Control, Inc.*, 917 F.2d 327, 335 (7th Cir.1990), *cert. denied*, 499 U.S. 975, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991)). This court will find an abuse of discretion when the district court relies on clearly erroneous findings of fact or uses an erroneous legal standard. *Newsom v. Norris*, 888 F.2d 371, 373–74 (6th Cir. 1989). On appeal, Ekco contends that the district court abused its discretion in giving insufficient weight to numerous alleged mitigating factors, and in imposing a penalty allegedly disproportionate to that imposed against other RCRA violators. We address each argument in turn.

### A. Mitigating Factors

In determining whether the court gave Ekco short shrift in its treatment of the

---

4. In a June 1990 letter to the EPA, an Ohio EPA official expressed his view that the consent order did not independently require Ekco to document its financial responsibility for third-party claims. There is no evidence that Ekco was aware of the letter at the time, or relied on the letter in any way. Because we conclude that the consent order is unambiguous, we need not resort to extrinsic evidence. Moreover, the Ohio EPA was not a party to the consent order, and the view of one of its officials is of no weight in determining its terms.

numerous alleged mitigating factors, we first examine the purpose of the financial responsibility regulations, which is to require the owner/operator of a hazardous waste facility to document that it has secured the resources required to close the facility in an appropriate and safe manner, and to pay third-party claims that may arise from its operations. *Vineland Chem. Co. v. United States EPA,* 810 F.2d 402, 404 n. 1 (3d Cir.1987). The timing of these obligations is critical. The regulations require that the owner/operator secure the necessary funds, and document that it has done so, *prior* to closure. This requirement is imposed to reduce the risk that insufficient funds will be available after the facility is shut down, when the owner/operator may not have the economic ability or incentive to devote resources to a defunct operation. *See generally* 47 Fed.Reg. 32274 (1982) (interim rules regarding hazardous waste treatment, storage and disposal facilities). Similarly, the regulations set forth specific requirements regarding the *manner* in which the funds are to be secured to provide the appropriate level of assurance that the funds will, in fact, be available when needed. *Id.*

■ Mindful of these significant regulatory goals, we reject Ekco's contention that the $1000 per day penalty was excessive because AHP always had the financial resources to close the impoundment and satisfy third-party claims, and ultimately provided the necessary documentation. Ekco's "no harm—no foul" theme, recurrent throughout this appeal, simply misses the mark. Ekco was required to have secured the funds and documented their existence on each day of each year in question. It cannot escape the consequences of its inaction by pointing to its eventual, and untimely, compliance.

■ We are persuaded, however, that the district court gave too little weight to the fact that Ekco substantially complied with its closure and post-closure care obligations on

June 25, 1990, when it submitted AHP's letter of credit; and with its third-party claims obligations on September 29, 1992, when it submitted AHP's guarantee. The court found that technical defects existed in both instruments, leading it to continue the $1000 per day penalty for each violation until final abatement. The penalty imposed for the period following Ekco's substantial compliance is significant, as the time period involved exceeds two years for two violations, and five months for the third violation.

The EPA legitimately may require that financial responsibility requirements be satisfied in the manner specified in the regulations, and an owner/operator's failure to comply with those requirements renders it subject to the imposition of penalties. In assessing the seriousness of a violation of this type, however, the court should consider principally whether the defects threaten the availability of the funds. Other relevant factors include the violator's attempt to cure the defects, whether there are impediments to cure that are outside the violator's direct control, and the timeliness of the violator's response.

We conclude that the amount of the penalty imposed here is excessive, because the record does not reflect that the defects in the letter of credit and guarantee in any way impaired the availability of the funds. There is no indication that the defects in the letter of credit, e.g., the failure to provide a duplicate trust agreement and to name Ekco in the letter of credit itself, had any bearing on the bank's obligation to pay Ohio EPA upon presentment. Likewise, there is no evidence that AHP's guarantee was invalid when originally submitted, and its sole "defect" was in having an effective date of 1988 rather than the date on which it was executed.[5] Ekco documented that secured funds were available in amounts that were satisfactory to Ohio EPA. The principal purpose of the regulations thus was fulfilled, and Ekco should not be required to pay the same amount in penalties for the period following its substan-

---

5. At oral argument, plaintiff's counsel acknowledged that Ohio EPA rejected the backdated guarantee out of a concern that Ekco was attempting to reduce its liability for penalties for the years before it submitted the guarantee. If this is indeed the case, Ohio EPA could have accepted the guarantee while reserving the right to contest its relevance to the issue of penalties. As it is, Ohio EPA's insistence on a 1992 effective date operated to significantly reduce the scope of the guarantee.

tial compliance as it must pay for the period when it was in complete default. We therefore remand to permit the district court to re-assess the proper penalty to be imposed for the periods noted above.

■ The district court did not abuse its discretion in its assessment of Ekco's remaining mitigation claims. Ekco concedes that the amount of its penalty can be based on the economic benefit gained through noncompliance, but contends that the court erred by calculating the amounts saved by *Ekco* in not procuring a letter of credit and liability insurance coverage, rather than with reference to the costs ultimately incurred by *AHP* in procuring a letter of credit and in submitting a guarantee. Ekco, not AHP, was bound by the regulations and consent order.[6] Until AHP stepped forward, Ekco was required to comply with the regulations, and realized cost savings by not doing so.[7]

■ Ekco's claim that it delayed in complying with its financial responsibility obligations based upon its good faith reliance on the advice and interpretations of governmental officials is plainly contradicted by the record. The district court detailed at least 28 written or telephonic communications between Ekco's representatives and Ohio EPA in which Ekco was informed, repeatedly and unequivocally, that it was obligated to comply with all three financial responsibility requirements. In defending its delay, Ekco relies in part on the September 1989 notice that it should revise its closure estimates prior to providing financial assurances, and claims that it could not provide financial assurances until it could revise its estimates, and it could not revise its estimates until it revised its closure plan. Ekco does not explain, however, why it defaulted in its obligations *until* September 1989. For the period following September 1989, it is sufficient to note that Ekco was able to revise its estimates for purposes of submitting financial assurances, as evidenced by the fact that it did so in June 1990 with AHP's $1.5 million letter of credit. Ekco defends its failure to document responsibility for third-party claims, arguing that it interpreted, in good faith, § 265.147 and the consent order as not imposing this obligation. Admittedly, the cases addressing the effect of the LOIS amendment made Ekco's obligation under § 265.147 less than crystal clear. The same cannot be said of its obligation under the consent order, however. Moreover, the repeated and consistent notices given by Ohio EPA negate Ekco's claim of good faith.

■ Finally, Ekco contends the amount of the penalty imposed exceeds the amount necessary to deter it from future violations. The district court properly considered the deterrence effect not just on Ekco, but on the regulated community as a whole. Moreover, given Ekco's apparent view that the financial responsibility requirements take a far-distant seat to its other RCRA obligations and its contentions that its ultimate compliance substantially excuses its lengthy delay in so doing, the deterrence message sent by the district court's penalty was one sorely needed.

## B. Allegedly Disproportionate Penalty

■ Ekco contends that the court abused its discretion in imposing a penalty significantly higher than penalties imposed against other owners/operators for similar violations. The penalties imposed in other cases are indeed relevant. *See Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1207 (6th Cir. 1988) (civil damage awards 8 to 40 times award made in prior case excessive, and shocked judicial conscience). The reasonableness of a penalty, however, is a fact-driven question, one that turns on the circumstances and events peculiar to the case at hand.

Viewed in this light, the decisions relied upon by Ekco do not provide meaningful guidance. Ekco relies almost exclusively on

---

6. While Ekco vigorously maintains that AHP was at all times obligated to satisfy its indemnity agreement, AHP's obligation is less than clear from the indemnity language in the purchase documents themselves, as the district court so found.

7. We find no evidentiary error in the court's consideration of plaintiff's expert testimony on the cost savings to Ekco.

EPA administrative cases, decided at the earliest stages of the enforcement process, in which violators were assessed penalties in the thousands-of-dollars range for violating financial responsibility requirements.[8] Ekco was in a position analogous to these violators in 1989 when it entered into a consent order requiring it to pay $55,478 for the violations cited in the administrative complaint. *This* case was brought several years later, following Ekco's continued default in its obligations under both the regulations and the consent order.

■■■■ Ekco acknowledges that significantly higher penalties have been imposed in RCRA cases,[9] but contends that these cases are inapposite because the violations involved conduct that actively caused environmental harm.[10] In contrast, argues Ekco, its violations merely involved a failure to provide the EPA with financial documentation. Ekco's assessment of the relative seriousness of a violation of the financial responsibility regulations is questionable. These regulations are not mere paperwork requirements, and a party cannot comply by submitting a financial statement or other indicators of its net worth. The purpose of these regulations is to ensure that adequate funds are *secured* (through, e.g., a letter of credit, guarantee or liability policy) in the present to meet the future financial needs for closing a hazardous waste site and satisfying any third-party claims that might arise therefrom. A present violation of these regulations may significantly impair the ability to close and remediate the site when needed and to protect third parties from harm. This risk of future harm posed by a hazardous waste facility such as that owned by Ekco, found by the district court to present serious risks to human health and the environment,[11] is no less important a consideration than the risk of present harm caused by activities causing contamination. Thus, we are not persuaded that the district court imposed a penalty disproportionate to other RCRA penalties, and find no abuse of discretion.

We **REVERSE** the imposition of civil penalties pertaining to 40 C.F.R. § 265.143, for the period June 25, 1990 to September 20, 1992; 40 C.F.R. § 265.145, for the period June 25, 1990 to July 28, 1992; and 40 C.F.R. § 265.147, for the period from September 29, 1992 to March 11, 1993. We **REMAND** to the district court for a redetermination of

8. *E.g., In the Matter of Marley Cooling Tower Co.,* No. RCRA–0988–008, 1989 RCRA LEXIS 22 (Nov. 30, 1989) ($7000 penalty for failing to update financial assurances and in failing to demonstrate financial responsibility for third-party claims); *In the Matter of Landfill, Inc.,* Appeal No. 86–8, 1990 RCRA LEXIS 65 (Nov. 30, 1990) (financial assurance penalty of $1900); *In re Frit Indus.,* No. RCRAVI–415–H, 1985 RCRA LEXIS 4 (Aug. 5, 1985) (financial assurance penalty of $1200). Ekco acknowledges that later administrative cases have imposed more significant penalties for financial responsibility requirement violations. *In the Matter of Harmon Electronics,* No. RCRA–VII–91–H–0037, 1994 RCRA LEXIS 52 (Dec. 12, 1994) ($251,875 for four years of noncompliance); *In the Matter of Standard Tank Cleaning Corp.,* No. II–RCRA–88–0110, 1991 RCRA LEXIS 47 (Mar. 21, 1991) ($145,313 for six years of noncompliance), *aff'd,* Appeal No. 91–2 (July 19, 1991).

9. *E.g., United States v. Production Plated Plastics, Inc.,* No. 932055, 1995 WL 428451, 1995 U.S.App. LEXIS 20539 (6th Cir. July 19, 1995) (affirming $1.5 million penalty, which amounted to $400 per day); *United States v. Midwest Suspension and Brake,* 49 F.3d 1197 (6th Cir.1995) (affirming $50,000 penalty, which amounted to $2500 per day); *United States v. Bethlehem Steel Corp.,* 829 F.Supp. 1047, 1057 (N.D.Ind.1993) ($4.2 million; court refused to impose per diem amount, but penalty equalled roughly $1500 per day); *United States EPA v. Environmental Waste Control, Inc.,* 710 F.Supp. 1172 (N.D.Ind.1989) ($2.778 million penalty, which amounted to $2000 per day), *aff'd,* 917 F.2d 327 (7th Cir. 1990), *cert. denied,* 499 U.S. 975, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991); *United States v. T & S Brass and Bronze Works, Inc.,* 681 F.Supp. 314 (D.S.C.) ($194,000 penalty, which amounted to $1000 per day), *aff'd in part and vacated in part on other grounds,* 865 F.2d 1261 (4th Cir.1988) (Table).

10. Ekco's characterization of the violations involved in prior cases is not altogether accurate. *See Bethlehem Steel Corp.,* 829 F.Supp. at 1057 ($4.2 million penalty for failure to timely submit preliminary assessment plan, remedial investigation report, and corrective action plan, as required by underground injection well permits).

11. The district court's extensive findings regarding the risks posed by the cadmium, chromium, lead, TCA, TCE and vinyl chloride contaminating the Massillon facility are reported at *Ekco Housewares, Inc.,* 853 F.Supp. at 983–86. Ekco does not dispute the accuracy of these findings.

penalties for these time periods.   In all other respects we **AFFIRM**.