**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 8 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

POWER ENGINEERING COMPANY;
REDOUBT, LTD.; and RICHARD J.
LILIENTHAL,

      Defendants-Third-Party
      Plaintiffs-Appellants,

v.

JACK LILIENTHAL,

      Third-Party-Defendant.

No. 98-1273

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 97-B-1654)**

---

John F. McBride (John J. Zodrow with him on the briefs), Zodrow et al. P.C.,
Denver, Colorado, for Defendants-Appellants.

Greer Goldman, Department of Justice, Washington, D.C. (Lois J. Schiffer,
Assistant Attorney General, Henry L. Solano, United States Attorney, Stephen D.
Taylor, Assistant United States Attorney, Denver, Colorado; John A. Bryson, John
N. Moscato, Lisa E. Jones, Attorneys, Department of Justice, Washington, D.C.;
and Thomas Sitz, General Counsel for Office of Enforcement, Compliance and
Environmental Justice, Environmental Protection Agency, Denver, Colorado, with
him on the briefs), for Plaintiff-Appellee.

Before **EBEL**, **MAGILL**[*] and **LUCERO**, Circuit Judges.

**EBEL**, Circuit Judge.

Plaintiff-Appellee United States, acting on behalf of the Environmental Protection Agency ("EPA"), sought a mandatory preliminary injunction directing Defendant-Appellants Power Engineering Company ("PEC"), Redoubt, Ltd., and Richard J. Lilienthal (collectively, "Defendants"), to comply with the financial assurance regulations adopted by the Colorado Department of Public Health and Environment ("CDPHE") under authority delegated to Colorado by the EPA pursuant to the Resource Conservation and Recovery Act of 1976 ("RCRA"). The district court granted the mandatory preliminary injunction, requiring Defendants to provide financial assurances in the amount of $3,500,000 to ensure remediation of ground and water contamination caused by chromium and other by-products of PEC's metal refinishing business. Defendants appeal the grant of the preliminary injunction. We affirm.

---

[*]Honorable Frank Magill, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

# I. BACKGROUND[1]

## Statutory and Regulatory Background

In 1976, Congress enacted RCRA, a comprehensive statutory scheme providing cradle-to-grave oversight of solid and hazardous waste. See 42 U.S.C. § 6902; United States v. Colorado, 990 F.2d 1565, 1570 (10th Cir. 1993); United States v. Power Engineering Co., 10 F. Supp.2d 1145, 1147 (D. Colo. 1998) ("PEC"). RCRA's Subtitle C, 42 U.S.C. §§ 6921-39, governs the generation, transportation, storage, disposal, and treatment of hazardous wastes to minimize present and future threats to human health and the environment. See 42 U.S.C. § 6924(a); United Technologies Corp. v. EPA, 821 F.2d 714, 716 (D.C. Cir. 1987). To that end, section 3004 of RCRA, 42 U.S.C. § 6924, directs the EPA to promulgate regulations establishing standards for owners and operators of hazardous waste facilities, such as standards for "financial responsibility (including financial responsibility for corrective action) as may be necessary or desirable." 42 U.S.C. § 6924(a)(6). Section 3004 also permits the EPA to promulgate regulations establishing standards for compliance with section 3005 of RCRA. See 42 U.S.C. § 6924(a)(7). Section 3005 of RCRA, 42 U.S.C. § 6925,

---

[1]A more detailed background of RCRA and the facts can be found in the district court's memorandum order and opinion, United States v. Power Engineering Co., 10 F. Supp.2d 1145 (D. Colo. 1998).

prohibits any person from treating, storing, or disposing of hazardous waste or constructing any hazardous waste facility for such treatment, storage, or disposal without (1) a permit issued pursuant to Section 3005; or (2) designation of "interim status," obtained by notifying the EPA of the person's hazardous waste activities and submitting an application for a permit. 42 U.S.C. § 6925(a) & (e).

If authorized by the EPA, a state may "carry out [its own hazardous waste] program in lieu of the Federal program" under Subtitle C and "issue and enforce permits for the storage, treatment, or disposal of hazardous waste." 42 U.S.C. § 6926(b); see Colorado, 990 F.2d at 1569. Action taken by a state pursuant to its federally authorized program has "the same force and effect as action taken by the [EPA]." 42 U.S.C. § 6926(d); see Colorado, 990 F.2d at 1569.

Pursuant to EPA authorization, Colorado implemented its own hazardous waste program, and promulgated regulations governing generators of hazardous waste and the operation and maintenance of hazardous waste treatment, storage, and disposal facilities. See generally, 6 Colo. Code Regs. 1007-3 ("C.C.R.") §§ 262, 264-68; Colorado, 990 F.2d at 1571; PEC, 10 F. Supp.2d at 1148. Colorado's regulations are substantially identical to the EPA's regulations, such that analysis of the federal scheme can "overlay[] and define[] that of Colorado." See Sierra Club v. United States Dept. of Energy, 734 F. Supp. 946, 947 (D. Colo. 1990). Among the state's regulations are the so-called financial assurance

- 4 -

requirements, located in C.C.R. § 266, which require owners and operators of all hazardous waste facilities to document that they have secured the financial resources required for closure and, if necessary, post-closure of their facilities in an appropriate and safe manner, and to pay third-party claims that may arise from their operations. See C.C.R. §§ 266.14 & 266.16; PEC, 10 F. Supp.2d at 1146.[2] The specifics of Colorado's regulatory scheme will be discussed further in the relevant context.

For present purposes, however, it is useful to identify two propositions which the district court stated, and which neither party challenges on appeal. First, according to the district court, the EPA "retains the right to bring enforcement actions compelling compliance with Colorado's hazardous waste regulations." PEC, 10 F. Supp.2d at 1148 (citing 42 U.S.C. §§ 6928, 6934, & 6973; 49 Fed. Reg. 41036 (1984); 51 Fed. Reg. 37729 (1986); 54 Fed. Reg. 20847

_____

[2]According to the C.C.R. § 265.111,

The owner or operator [of a hazardous waste facility] must close the facility in a manner that:

(a) Minimizes the need for further maintenance, and

(b) Controls, minimizes or eliminates, to the extent necessary to protect human health and the environment, post-closure escape of hazardous waste, hazardous constituents, leachate, contaminated runoff, or hazardous waste decomposition products to the ground or surface waters or to the atmosphere . . . .

(1989); 56 Fed. Reg. 21601 (1991); 59 Fed. Reg. 16568 (1994)).[3]  Second, even

though the state resolved its enforcement proceedings against Defendants in this

case through an administrative order, the district court assumed the EPA had

"overfile" power under RCRA to bring its own subsequent enforcement action.

See PEC, 10 F. Supp.2d at 1146; see also Bryan S. Miller, Harmonizing RCRA's

Enforcement Provisions: RCRA Overfiling in Light of Harmon Industries v.

Browner, 5 Envtl. Law. 585, 586 (1999) ("Overfiling occurs when EPA initiates

an enforcement action after a state begins an action on the same matter.").

---

[3] 42 U.S.C. § 6928 provides that the EPA may issue an order assessing a civil penalty, bring suit in federal court "for appropriate relief, including a temporary or permanent injunction," or both, when it determines that a violation of "any requirement" of Subtitle C has occurred. Id. at § 6928(a)(1). It further provides that when a violation of Subtitle C occurs in a state which is authorized to carry out a hazardous waste program, the EPA shall give notice to the state prior to issuing an order or commencing an action. See id. at § 6928(a)(2).

42 U.S.C. § 6934 provides that the EPA may order an owner or operator of a hazardous waste facility to conduct monitoring, testing, analysis, and reporting under certain conditions. See id. at § 6934(a).

42 U.S.C. § 6973 provides that the EPA may bring suit against a person who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of hazardous waste that presents an imminent and substantial endangerment to health or the environment. See id. at § 6973(a).

The Federal Registers cited contain the EPA's approval of Colorado's hazardous waste program or revisions thereto. In them, the EPA states that "Colorado also has primary enforcement responsibility, although EPA retains the right to conduct inspections under Section 3007 of RCRA and to take enforcement actions" under 42 U.S.C. §§ 6928, 6934, & 6973. 49 Fed. Reg. 41036, 41037 (1984); see 51 Fed. Reg. 37729, 37730 (1986); 54 Fed. Reg. 20847, 20848 (1989); 56 Fed. Reg. 21601, 21602 (1991); 59 Fed. Reg. 16568, 16569 (1994).

On appeal, the parties focus their argument only on whether the EPA may enforce the financial assurance provisions of the state regulations <u>independently</u> of compelling compliance with the entire permitting scheme. Therefore, because the propositions set forth above are not in dispute in this appeal, we assume without deciding for purposes of this appeal (1) that the EPA may enforce the state's hazardous waste regulations, <u>see</u> <u>United States v. Marine Shale Processors</u>, 81 F.3d 1361, 1367 (5th Cir. 1996) ("42 U.S.C. § 6928(a) gave EPA the power to enforce the substance of an approved state's program against private parties in that state."); and (2) that the EPA may do so even after the state has taken its own enforcement actions, <u>but see</u> <u>Harmon Indus., Inc. v. Browner</u>, 19 F. Supp.2d 988, 994, 996 (W.D. Mo. 1998) (recognizing that EPA could withdraw state authority or enforce a violation of RCRA "when the state remains inactive, after giving notice" pursuant to 42 U.S.C. § 6928(a)(2), but holding that EPA may not overfile under RCRA after state concludes enforcement action on same matter); <u>see also</u> Miller, <u>supra</u>, at 593 ("<u>Harmon Industries, Inc. v. Browner</u> is the first federal court decision that directly addresses the issue of whether EPA may overfile under RCRA after a state concludes an enforcement action.").[4]

---

[4]Unlike <u>Harmon</u>, <u>Marine Shale</u> did not arise in an overfile context. That is, while the EPA attempted to override a state enforcement action in <u>Harmon</u>, the EPA proceeded in <u>Marine Shale</u> in the absence of any clear state enforcement proceedings. Thus, while <u>Marine Shale</u> spoke to whether the EPA can enforce

(continued...)

**Parties**

The United States is the plaintiff acting on behalf of the EPA. PEC is a Colorado corporation located in Denver. From approximately 1968, PEC has operated a business of refinishing metal crankshafts, connecting rods, and rod journals for large diesel engines used in heavy equipment. Redoubt owns the land and buildings leased to PEC, and thus is the owner of PEC's facility under Colorado regulations. Lilienthal is the president of PEC and owns 51% of the outstanding stock of both PEC and Redoubt. For purposes of the preliminary injunction motion, Lilienthal agreed that he is an "owner" and "operator" of PEC and as such subject to any order entered by the district court directing Defendants to secure financial assurances.

**Nature of the Case**

PEC's refurbishing operations produce more than 1,000 kilograms of hazardous waste per month, and the facility stores more than 6,000 kilograms per

---

[4](...continued) state regulations promulgated pursuant to RCRA, it did not address the issue of whether the EPA can do so once a state has initiated its own enforcement action. Harmon, on the other hand, spoke to whether the EPA can overfile extant state enforcement proceedings, but Harmon does not address whether the EPA may enforce state implementing regulations in the absence of any state enforcement effort. In fact, the EPA brought its complaint in Harmon under federal regulations. See Harmon, 19 F. Supp.2d at 992 n.4.

month.  The facility generates approximately thirteen different waste streams, including arsenic, lead, mercury, and hexavalent chromium contaminated media. In 1992, Denver Health and Hospitals ("DHH") contacted the CDPHE concerning a discharge into the Platte River of high levels of hexavalent chromium.  After investigation, DHH determined that PEC was the likely sources of the discharge. The CDPHE then conducted compliance review inspections at PEC in August and September of 1992, and reported numerous violations of federal and state regulations governing the treatment, storage, and disposal of hazardous waste, which the district court set out at length.  In addition, PEC never applied for a permit or obtained interim status.

Although PEC notified the CDPHE in 1986 that it was a generator of certain hazardous waste, PEC failed to assess adequately its generation, treatment, storage, and disposal of hazardous waste, and the CDPHE did not know the severity and extent of PEC's noncompliance with the state hazardous waste program until the August 1992 inspection.  As a result of PEC's illegal storage and disposal of hazardous waste, groundwater at and under the facility, as well as groundwater under areas outside the facility, is contaminated with levels of hexavalent chromium greatly exceeding established toxicity levels.[5]  A plume of

---

[5]The district court noted that PEC currently is managing hazardous wastes in compliance with applicable storage regulations.  See PEC, 10 F. Supp.2d at

chrome contamination extends from the facility approximately 3,310 feet into the South Platte Valley Fill Aquifer, which is connected to the South Platte River.

After inspecting PEC's facility again in 1993 and 1994, the CDPHE issued an Initial Compliance Order on June 28, 1994. That order was stayed at PEC's request, while PEC and the CDPHE held conferences between 1994 and 1996. The CDPHE then issued a Final Administrative Compliance Order on June 13, 1996 ("Order"). While complying with certain requirements of the Order, PEC failed to meet others. Accordingly, on December 26, 1996, the CDPHE issued an Administrative Penalty Order assessing civil penalties of approximately $1,875,000. Defendants did not appeal the penalty, but neither have they paid any portion of it.

The EPA was displeased with the manner in which the CDPHE sought to enforce the RCRA regulations. At the EPA's request, the United States exercised its authority to seek Defendant's compliance with the state regulations. As part of its suit, the United States sought a mandatory preliminary injunction directing Defendants to comply with the regulations for financial assurances. After a hearing, the district court granted the preliminary injunction pursuant to § 3008(a) of RCRA, 42 U.S.C. § 6928(a), and Fed. R. Civ. P. 65. Defendants now appeal.

---

[5](...continued)
1151.

## II. DISCUSSION

**Standard of Review**

We review the grant of a preliminary injunction for abuse of discretion. See Elam Constr., Inc. v. Regional Trans. Dist., 129 F.3d 1343, 1346 (10th Cir. 1997), cert. denied, 118 S. Ct. 1363 (1998). Granting a preliminary injunction is proper where the moving party shows: (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) the threatened harm outweighs injury which the injunction may cause the opposing party; and (4) the injunction will not be adverse to the public interest. See Kansas Health Care Assoc., Inc. v. Kansas Dep't of Soc. & Rehab. Servs., 31 F.3d 1536, 1542 (10th Cir. 1994). A mandatory preliminary injunction (i.e., one that directs a party to act) imposes "an even heavier burden on [the movant] of showing that the four factors listed above weigh heavily and compellingly in movant's favor." Id. at 1543. We review the underlying issues of law decided by the district court de novo. See Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1357 (10th Cir. 1990); Tefel v. Reno, No. 98-4616, 1999 WL 496227, at *8 (11th Cir. July 14, 1999).

The district court found all four factors supporting a preliminary injunction. See PEC, 10 F. Supp.2d at 1162-65. As the government notes, Defendants on appeal do not appear to challenge the finding of the latter three factors. Rather,

Defendants challenge the applicability of RCRA and state implementing regulations, an attack that goes to the government's likelihood of success on the merits. Additionally, Defendants raise questions about the appropriateness of a preliminary injunction ordering financial assurances. We address Defendant's arguments in turn.

**A.**

Defendants challenge the district court's holding that PEC currently disposes of hazardous waste, an activity which would subject it to Colorado's regulations for facilities treating, storing, or disposing of hazardous waste ("TSD facilities"). We agree with the district court.

Colorado regulations define a TSD facility as "a location at which hazardous waste is subjected to treatment, storage, or disposal and may include a facility where hazardous waste is generated." C.C.R. § 260.10. Under the regulations, "[a] generator [of hazardous waste] who treats, stores, or disposes of hazardous waste on-site must comply with the applicable standards and permit requirements set forth in Parts 264, 265, 266, and Part 100 of these regulations." C.C.R. § 262.10 n.2.[6] C.C.R. § 266 further provides that its financial assurance

_____

[6]C.C.R. § 264 sets out the standards for owners and operators of hazardous waste treatment, storage, and disposal facilities with permits. C.C.R. § 265 sets

(continued...)

- 12 -

requirements "apply to owners and operators of all hazardous waste facilities."

C.C.R. § 266.10(a). RCRA and the state regulations define "disposal" as

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3); C.C.R. § 260.10.

For substantially the same reasons discussed thoroughly in the district court's opinion, we find that Defendants currently are disposing of hazardous wastes illegally in three ways:

> (1) the Facility's air scrubbers dispose a mist of hexavalent chromium onto Facility soil; (2) the Facility failed to remediate the soil contaminated by a yellow/orange liquid that leaked from air scrubbers down the west side of the Facility's main building; and (3) the Facility failed to remediate the three open waste piles of contaminated soil excavated from beneath the chrome-plating tanks and the remaining contaminated soil located beneath the chrome-plating tanks.

PEC, 10 F. Supp.2d at 1157, 1157-60.

Furthermore, we conclude that PEC is subject to Colorado's financial

---

[6](...continued) out interim status standards applicable to owners and operators of hazardous waste treatment, storage, and disposal facilities who have obtained interim status as well as those who have failed to do so. See C.C.R. § 265.1(b); United States v. Ekco Housewares, Inc., 62 F.3d 806, 809 (6th Cir. 1995); PEC, 10 F. Supp.2d at 1150. C.C.R. § 266 sets out financial assurance requirements. C.C.R. § 100 sets out the regulations for permit applications.

assurance requirements. By stipulation before the district court for purposes of the preliminary injunction motion, the parties agreed that PEC "is and was a 'generator'" of hazardous waste as defined by RCRA and Colorado regulations. Thus, PEC "must comply with the applicable standards and permit requirements" of the Colorado regulations for generators of hazardous waste who are TSD facilities, including the financial assurance requirements of § 266. C.C.R. § 262.10 n.2. Additionally, those financial assurance requirements "apply to" Redoubt and Lilienthal as "owners and operators of [a] hazardous waste facilit[y]." C.C.R. § 266.10(a).

We do not find Defendants' argument to the contrary persuasive. Defendants contend that, even if they are disposers of hazardous waste, they are not a disposal facility and therefore not a TSD facility. Defendants rely on C.C.R. § 260.10, which defines a "disposal facility" as a facility "at which hazardous waste is <u>intentionally</u> placed into or on any land or water, <u>and at which waste will remain after closure</u>." Defendants argue that because they intend "to remedy the contamination of the site while PEC is still a going concern," no waste will remain after closure, thereby precluding them from being a disposal facility by definition.

We find no merit to this argument. Defendants essentially contend that any generator currently disposing of hazardous waste on their facility does not have to

- 14 -

comply with regulations for TSD facilities so long as they intend to clean up the waste before closure. There is no basis in the provision cited for such a sweeping subjective loophole. As an initial matter, the intent element in the definition of "disposal facility" pertains to whether hazardous waste was "intentionally placed" on land or water, not whether the polluter intends the hazardous waste to remain. Cf. United States v. Allegan Metal Finishing Co., 696 F. Supp. 275, 287 (W.D. Mich. 1988) (refusing to read into 42 U.S.C. § 6925(e), interim status provision for "land disposal facility," "a state of mind requirement," based on the regulatory definition of "disposal facility," as to "whether the defendant intended the waste to remain [after closure]" (quotations omitted)). As the EPA has indicated, the purpose of the intent element in the definition of "disposal facility" is "to indicate the [EPA's] intent that the term does not apply to activities involving truly accidental discharge of hazardous waste," because the EPA posits that "permits logically can only be required for intentional disposal of hazardous waste." 45 Fed. Reg. 33066, 33068 (1980).

Moreover, we need not decide whether PEC is a "disposal facility." Unlike "disposal facility," the definition of "disposal" does not limit its reference only to those facilities at which hazardous waste will remain after closure. Rather, as noted, "disposal" encompasses "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid or hazardous waste into or on any land or

- 15 -

water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters." C.C.R. § 260.10. As a generator of hazardous waste that engages in its disposal, PEC is a TSD facility. See C.C.R. § 260.10. Furthermore, as a TSD facility, PEC must comply with the requirements of C.C.R. §§ 264, 265, 266, and 100; and as PEC's owner and operator, Redoubt and Lilienthal must meet the financial assurance requirements of C.C.R. § 266. See C.C.R. § 260.10 (defining TSD facility to include generators of hazardous waste "at which hazardous waste is subjected to treatment, storage, or disposal"); C.C.R. § 262.10 n.2 (generator disposing of hazardous waste is subject to C.C.R. §§ 264-66 & 100); C.C.R. § 266.10(a) (financial assurance provisions of C.C.R. § 266 apply to owners and operators of all hazardous waste facilities). The definition of "disposal facility" on its face does not negate these regulatory mandates, and Defendants' argument does not convince us otherwise.

**B.**

Defendants argue that "financial assurances are part and parcel of an integrated regulatory scheme governing pre-operational permitting of a TSD[ facility] which cannot be severed and applied separately from the balance of the regulatory scheme." Since the amount of financial assurances depends on the

- 16 -

cost estimates of closure and post-closure of the TSD facility, and since closure and post-closure plans are required for a person to obtain a permit, Defendants argue that the financial assurance requirements come into play only at the tail end of the regulatory scheme for permitting. Thus, Defendants assert that the district court at most could only require Defendants to (1) secure a permit covering treatment, storage, or disposal of hazardous waste; or (2) cease its illegal activities. Defendants conclude that the district court therefore erred in enjoining compliance with the financial assurance provisions.

We find Defendants' argument unsupportable. As an initial matter, § 3008 of RCRA, 42 U.S.C. § 6928, authorizes the EPA to commence an action "for appropriate relief, including a temporary or permanent injunction," for "any requirement" of Subtitle C, and to do so in states that have authorized hazardous waste programs as long as the EPA gives prior notice to the state. See 42 U.S.C. § 6928(a)(1)-(2). As noted, the district court stated, and neither party challenges, that the EPA may bring an overfile action under RCRA to enforce state implementing regulations. Thus, we turn to whether the EPA may require Defendants to comply only with Colorado's financial assurance requirements independent of requiring compliance with the entire permitting scheme.

Colorado's financial assurance requirements "apply to owners and operators of all hazardous waste facilities," and inter alia require "[a]n owner or

operator of <u>each</u> facility . . . [to] establish financial assurances for closure, and if applicable, post-closure of the facility." C.C.R. §§ 266.10(a) & 266.14 (emphasis added). By their terms, these regulations apply to all owners and operators of hazardous waste facilities; they are not limited to permit holders or applicants. In light of these clear provisions, we do not believe that the mere fact that the permit application requires a showing of compliance with the financial assurance provisions somehow renders these provisions applicable only in the context of permitting. <u>See</u> C.C.R. § 100.41. Based on the plain language of the Colorado financial assurance requirements, we conclude that the EPA's power to enforce Colorado's regulations includes the power to enforce the financial assurance requirements independent of requiring a permit. <u>See</u> <u>United States v. Ekco Housewares, Inc.</u>, 62 F.2d 806, 809, 812 (6th Cir. 1995) (finding defendant subject to EPA regulations for financial assurance until final closure is certified even though defendant never obtained interim status by applying for permit).

Defendants' remaining arguments on this issue do not dissuade us from our conclusion. Defendants attempt to buttress their position by arguing that the CDPHE shares their view that the financial assurance requirements cannot be enforced separately from the entire permitting scheme. As support, Defendants state that the "CDPHE has never required a generator of hazardous waste, such as PEC, who is illegally treating, storing or disposing of hazardous waste to provide

financial assurances."  In a related point, Defendants contend that the CDPHE has only considered PEC to be a generator of hazardous waste, and has never considered it also to be a TSD facility "subject to the permit regulations, including the financial assurance requirements."

The record belies Defendants' argument, because PEC's own environmental manager testified that the CDPHE told PEC that it was a storage and disposal facility that needed to obtain a permit pursuant to state regulations.  Additionally, while the CDPHE did not choose to require Defendants to comply with the financial assurance requirements in its Final Compliance Order, it believed it "[had] that option."

Rejecting Defendants' arguments, we hold that the EPA can enforce the state financial assurance requirements independent of requiring compliance with permitting.

## C.

Defendants assert that the district court's grant of a preliminary injunction directing them to provide financial assurances in the amount of $3,500,000 was "not directed towards requiring Defendants to obtain financial assurances for the operation of a TSD[ facility], but was a thinly disguised attempt to obtain prejudgment security to enforce any future judgment of the District Court."  In

particular, Defendants assert that the preliminary injunction was "for costs associated with remediation of existing contamination, not for remediation of any contamination that may exist if and when PEC closes its business." Defendants argue that the preliminary injunction was actually prejudgment security, and therefore it should be governed by Fed. R. Civ. P. 64. Defendants conclude that the preliminary injunction exceeds the scope of Rule 64 because "the prejudgment remedies available to the United States [under Rule 64] are limited to attachment, receivership, garnishment and sequestration." Additionally, Defendants contend that the district court erred in granting the preliminary injunction because "RCRA does not have a provision providing prejudgment remedies to secure a future judgment in an enforcement action under § 3008."[7]

We reject Defendants' arguments at the outset, because we do not interpret the district court's preliminary injunction for financial assurances to be an order for prejudgment security for pre-closure remediation. We recognize that the district court ordered financial assurances based upon the costs of remediating the present contamination around the PEC facility. However, we believe the district court associated these remediation costs with closure and post-closure of the facility. First, as a legal matter, the district court directed Defendants "to provide

_____

[7]The United States contends that Defendants did not properly raise this objection before the district court. We have examined the record and conclude that Defendants sufficiently raised the issue below.

financial assurances in accordance with 6 COLO. CODE REGS. 1007-3 § 266." See PEC, 10 F. Supp.2d at 1165. That the court ordered financial assurances "in accordance with" C.C.R. § 266 indicates that the requested assurances will be used for closure and post-closure costs. Second, as a factual matter, the district court appeared to assume that closure and post-closure costs for the facility would include costs for remediating the site in its current condition because Defendants have (1) violated hazardous waste regulations for decades; (2) failed to comply with the Final Compliance Order of the CDPHE respecting remediation of its open piles of hazardous waste; (3) failed to pay the civil penalty assessed by the CDPHE; (4) recently engaged in a pattern of debt reduction and asset forfeiture; and (5) threatened bankruptcy or abandonment of the facility if the federal or state government continues seeking the facility's compliance with applicable hazardous waste regulations. See PEC, 10 F. Supp.2d at 1157, 1163, 1165. Therefore, given Defendants' history of unwillingness to comply with RCRA and state implementing regulations, we believe that the district court properly considered remediation costs for the present contamination in calculating costs associated with financial assurances necessary for the facility's closure or post-closure. Accordingly, we hold that the district court properly ordered financial assurances for closure and post-closure of the facility.

**D.**

Finally, Defendants contend that the district court's calculation of the $3,500,000 figure for financial assurances was based on "nothing more than gross and speculative approximation." Because Defendants never have complied with applicable RCRA regulations by providing closure and post-closure plans, Defendants contend that the absence of those plans "is fatal to the United States' request for financial assurances," as such financial assurances "cannot be calculated without the detailed closure cost estimates required by the regulations."

We disagree with Defendants' argument. Even though PEC does not have closure and post-closure plans pursuant to C.C.R. § 265, the district court properly based its estimate of financial assurances on the costs of remediating present contamination at the site, under the assumption that the contamination will remain at closure. See supra Part II.C. Furthermore, the district court based its figure on estimates from the CDPHE and PEC itself. The CDPHE estimated the cost to remediate the contaminated soil and groundwater at between $3,000,000 and $6,000,000. PEC's counsel estimated that remediation of the site for contaminated soil would cost $2,300,000, and PEC's hydrologist estimated that remediation of the groundwater would cost $1,200,000. From these figures, the district court concluded that the government's request for financial assurances in the amount $3,500,000 was a "fair estimate of the costs of remediation," and

ordered financial assurances in that amount.  <u>PEC</u>, 10 F. Supp.2d at 1154.

We believe the district court's figure was supported by the evidence, given that the amount of financial assurances equaled the sum of PEC's own remediation estimates ($2,300,000 for site remediation and $1,200,000 for groundwater remediation), and was within the remediation estimated provided by the CDPHE ($3,000,000 to $6,000,000).  While Defendants and the government both admit that the estimates were rough rather than exacting, Defendants in large part were responsible for the inexact nature of the estimates because of their failure to develop closure and post-closure cost estimates pursuant to state regulations.  The district court did its best to estimate fairly closure costs under non-ideal circumstances of Defendants' creation, and we find the evidence supported the estimate.

## CONCLUSION

The district court did not abuse its discretion in issuing the mandatory preliminary injunction ordering Defendants to provide financial assurances in the amount of $3,500,000 pursuant to C.C.R. § 266.  The district court's order is AFFIRMED.